UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  09-60331-CR-COHN

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

SCOTT W. ROTHSTEIN,

                Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW, the Defendant, SCOTT W. ROTHSTEIN ("Mr. Rothstein" or "Defendant"), by and through his undersigned counsel, and respectfully files his Sentencing Memorandum to aid this Court in its determination of the sentence to be imposed in this matter at the Sentencing currently set for June 9, 2010, and states as follows:

## I.

## PRELIMINARY STATEMENT

Not just by his words alone,[1] but more importantly, by his actions, Scott Rothstein has demonstrated his profound recognition of the magnitude of the crimes he has committed and the harms he has caused many others.  Since the commission of his offenses, he has done every act conceivably possible under the circumstances to try to redress his wrongs; first, through tireless cooperation with law enforcement authorities and the turnover of all of his assets to the Government and, subsequently through his cooperation with representatives of the victims of his

_____

[1]    The Defendant has submitted a letter to the Court which is attached hereto as Exhibit "A".

fraud.  Moreover, his voluntary decision to return to the United States from Morocco[2] to "face the music", plead guilty and immediately hand over to the government, in effect, a "play-by-play" description of all of the intricate details of his crimes, as well as crimes of others,  has saved the Government (and ultimately the taxpayers) an untold amount of money, time, effort and has greatly conserved the resources of this Court.

Despite being subjected to an unprecedented, relentless public vilification by the local media, abandoned by literally every friend, shunned by his colleagues, and shamed beyond measure, Scott Rothstein has remained steadfastly committed to the task of helping to ensure that every "legitimate" investor be repaid.

Mr. Rothstein fully acknowledges that the shame, humiliation, public disgrace and scorn that he and his family has and continues to suffer is of his own doing and, therefore, does not expect any sympathy from this Court in fashioning its sentence.  Instead, he simply requests a sentence that is rational, not reflective of the media-induced hysteria and is proportionate to sentences received in comparable cases.

As such, for the reasons set forth below and for those further enumerated at the sentencing in this matter, undersigned counsel respectfully recommends that this Court sentence Scott Rothstein to a non-guidelines sentence of <u>30 years</u>, well below the advisory Guidelines range determined by the Presentence Investigation Report ("PSR").

This request is based upon the spirit of and the policy behind the advisory Guidelines, is supported by the reasons set forth under 18 U.S.C. § 3553(a) as a sentence which is "sufficient, but not greater than necessary to fulfill the purpose of sentencing" and is not disparate from sentences given in comparable cases.

---

[2]     Morocco has no extradition treaty with the United States.

## II.

### APPLYING THE ADVISORY FEDERAL
### SENTENCING GUIDELINES IN THIS CASE

Ever since the Supreme Court's decision in the *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines have no longer been mandatory, but rather are advisory with respect to a District Court's decision in fashioning an appropriate sentence. The Guidelines are merely a "starting point and the initial benchmark" in the Court's search for an appropriate sentence. *Gall v. United States*, 552 U.S. 38 (2007). In *Kimbrough v. United States*, 128 S.Ct. 558 (2007), the Supreme Court pointed out that the Sentencing Reform Act, as modified by its decision in *Booker* "contains an overarching provision instructing District Courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." *Id.* at 570. This provision must be honored through reference to all of the factors set forth under 18 U.S.C. § 3553(a). As such, consideration of the Sentencing Guidelines is just but one factor for the Court to consider when exercising its tremendous discretion in determining the appropriate sentence.

In this case, the Presentence Investigation Report ("PSR") calculates a total offense level of 43, a criminal history category of 1 and a Guideline imprisonment range of "life".[3]

As a general proposition, the Courts "may vary from Guideline ranges based solely on policy considerations including disagreements with the Guidelines". See *Kimbrough*. It is respectfully submitted that in this particular case (as in certain other major fraud cases referenced below) the applicable Guidelines are unreasonable and, by application, irrational. In support of this contention, it is first pointed out that the total offense level of 43, producing a life sentence

---

[3]     As per the Indictment, the total statutory maximum sentence cannot exceed 100 years. As such a formal pronouncement of a "life" sentence is not permitted. However, 100 years or even less than half that amount (i.e. 40 years) is certainly a "life" sentence, under any circumstance, given Mr. Rothstein's age (48).

range is, in fact, not the actual offense level produced by the Guideline calculations.  Indeed, a review of the PSR reveals that in considering all of the adjustments called for under the Guidelines the total offense level actually adds up to 52 (Amended PSR ¶45).  As the PSR goes on to note, "however, pursuant to Chapter 5, Part A, Comment (n.2), the total offense level may not exceed 43."  The absurdity of this simple arithmetic process producing a total offense level in a fraud case far exceeding a life sentence calculation is further demonstrated by an analysis and comparison of the adjustments that are provided for in major fraud cases versus adjustments in all other serious crimes under the Guidelines.

This fundamental flaw in the Guidelines was previously raised by counsel for defendant, Marc Dreier, in a case[4] substantially similar to Mr. Rothstein's (see argument below).  Attached as Exhibit "B" hereto is the same chart utilized by counsel for Mr. Dreier in his sentencing memorandum referencing the various enhancements in Sections 2A (Offenses Against the Person) and 2B (Basic Economic Offenses) of the Guidelines (excluding the loss chart at Section 2B1.1(b)1.  This chart clearly demonstrates that there are no other enhancements in Section 2B of the Guidelines – the section which applies to Mr. Rothstein's offense – nor any enhancement under Section 2A, dealing with violent crimes, which even <u>closely</u> <u>approaches</u> the 30 levels added under Section 2B1.1(b)1 (based on the amount of money involved in the fraud).  In fact, there are no double digit enhancements in either Sections 2A or 2B under the Guidelines.

---

[4]     *United States v. Marc Dreier,* No.  09-CR-00085 (S.D.N.Y.).

However, in fairness, the Guidelines do provide some double digit enhancements for the following crimes:

| Enhancement | Points Added |
|---|---|
| Obstruction of justice related to terrorism (111.2(b)(1)(C)) | 12 |
| Felony involving or intending to promote terrorism (3A1.3(a)) | 12 |
| Willfully boarding an aircraft with a dangerous weapon or material without regard for the safety of human life (2K 1.5(b)(1)) | 15 |
| Trafficking, receiving or possessing a portable rocket, missile, or launcher (21(2.1(b)(3)(A)) | 15 |
| Unlawfully entering or remaining in the United States after being convicted of certain major felonies (21-1.2(b)( 1)(A)) | 16 |
| Bid-rigging or price-fixing, if the volume of commerce exceeds $1,500,000,000 (2R1.1(b)(2)(H)) | 16 |

Yet, amazingly, when you compare the largest enhancements for loss amount under Section 2B1.1(b)(1) to all the other enhancements under the Guidelines, even in arguably more serious offenses, the enhancements under Section 2B1.1 simply dwarf the others, sometimes by more than double.

Not surprisingly, a review of the history of the increases in the fraud loss enhancements under Section2B1.1(b)(1) demonstrates that the increases are legislative/political reactions to the corporate scandals at Enron, WorldCom, Tyco, and others rather than being based on empirical evidence that more severe sentences were needed to deter further criminal conduct or protect the public. *See* U.S.S.G. §2B1.1 (historical notes) (2003 amendments) (noting a previous maximum enhancement of 26 levels).  Interestingly, these amendments were designed to "punish adequately offenses that cause catastrophic losses of magnitudes previously unseen, such as the serious corporate scandals that gave rise to certain portions of the Sarbanes Oxley Act." U.S.S.G. 2B1.1 (historical notes) (2003 amendments) (reason for amendments).  Guidelines that

are not empirically rooted but are instead politically motivated or based on other types of institutional pressure, undermine the factors of Section 3553(a).  In discussing this, one legal scholar noted:

> A general increase in federal economic crime sentences might have been justifiable on deterrence grounds if there were evidence that existing penalties were failing to deter potential offenders.  One indicator of sufficient stringent penalties for a class of crimes would be an increase in the general incidents of such crimes.  However, the available statistics show exactly the opposite trend for economic offenses.

See Frank O. Bowman, III, Pour encourager les autres?  The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed, 1 Ohio St. J. Crim. Law 373, 419 (2003-2004) (collecting evidence).

Of course, this grossly disproportionate enhancement of 30 points under Section 2B1.1(b)(1) does not alone cause the offense level to calculate at a life range.[5]  No, instead "lopped" on to the Base Offense level calculations in the PSR are increases by six levels for 250 or more victims and 2 levels for "sophisticated means" under Section 2B1.1(b)(2)(c), producing a resulting base offense level 43 ("life").  One wonders how it would be realistic to expect a near $400 million loss fraud not to involve numerous victims and involve sophisticated means (as defined so broadly by the Guidelines).  Thus, for all practical purposes before any other common upwards adjustments are even considered, such as Role in the Offense (Section 2B1.1(a)) a 200-400 million dollar loss fraud will almost universally yield a "life" sentence under the guidelines.

This draconian result is further magnified by what becomes a meaningless application in this case of Section 3E1.1(a) "Adjustment For Acceptance of Responsibility."  Normally, a defendant's decision to accept responsibility, assist in the investigation of his crime, plead guilty and conserve the Government's and Court's resources is meaningfully recognized under the

---

[5]    Combined with the 7 points base offense under Section 2B1.1(a)(1) the 28 points enhancement yields a subtotal of 35 points.

Guidelines (usually a 3 level reduction pursuant to Sections 3E1.1(a) and 3E1.1(b).  Here, as a result of a determination that the total offense level is 52, the application of Sections 3E1.1(a) and 3E.1.1(b) are meaningless.  Mr. Rothstein gains no benefit whatsoever under the Guidelines for what has clearly been extraordinary acceptance of responsibility.  Given this arithmetic absurdity, Mr. Rothstein would suffer no less under the Guidelines if he had cost the Government millions by going to trial.

This unreasonable result and consequent irrational application of the Guidelines becomes even more apparent upon review of the statistics for sentences imposed in certain other crimes such as murder, rape, etc. which arguably are as serious, if not more so, than the crimes committed in the instant case.

Information kept by the United States Sentencing Commission, Office of Policy Analysis for the years 2006, 2007, 2008 and 2009 regarding the Average Length of Imprisonment by Primary Offense Category (attached as Composite Exhibit "C") reveals, surprisingly, the following relevant data:

| Fiscal Year 2009 National | | | |
|---|---|---|---|
| **PRIMARY OFFENSE** | **MEAN MONTHS** | **MEDIAN MONTHS** | **NUMBER** |
| **Murder** | 274.5 | 270.0 | 93 |
| **Kidnapping/Hostage Taking** | 212.8 | 168.0 | 41 |
| **Sexual Abuse** | 96.0 | 60.0 | 460 |
| **Racketeering/Extortion** | 102.7 | 60.0 | 580 |
| **National Defense** | 53.8 | 34.0 | 58 |

| Fiscal Year 2008 National | | | |
|---|---|---|---|
| **PRIMARY OFFENSE** | **MEAN MONTHS** | **MEDIAN MONTHS** | **NUMBER** |
| **Murder** | 221.6 | 210.0 | 69 |
| **Kidnapping/Hostage Taking** | 205.3 | 180.0 | 56 |
| **Sexual Abuse** | 92.1 | 63.0 | 485 |
| **Racketeering/Extortion** | 83.1 | 51.0 | 740 |
| **National Defense** | 53.2 | 26.5 | 54 |

| Fiscal Year 2007 National | | | |
|---|---|---|---|
| **PRIMARY OFFENSE** | **MEAN MONTHS** | **MEDIAN MONTHS** | **NUMBER** |
| **Murder** | 258.5 | 235.0 | 81 |
| **Kidnapping/Hostage Taking** | 169.0 | 156.5 | 48 |
| **Sexual Abuse** | 94.3 | 60.0 | 381 |
| **Racketeering/Extortion** | 89.3 | 51.0 | 620 |
| **National Defense** | 40.2 | 13.0 | 32 |

| Fiscal Year 2006 National | | | |
|---|---|---|---|
| **PRIMARY OFFENSE** | **MEAN MONTHS** | **MEDIAN MONTHS** | **NUMBER** |
| **Murder** | 253.1 | 240.0 | 77 |
| **Kidnapping/Hostage Taking** | 216.5 | 204.0 | 61 |
| **Sexual Abuse** | 103.5 | 60.0 | 256 |
| **Racketeering/Extortion** | 95.6 | 60.0 | 576 |
| **National Defense** | 49.2 | 29.0 | 34 |

One asks, where is the logic behind guidelines that almost automatically calculate life sentences in fraud cases, which far exceed the average sentences for the most heinous violent crimes?

Under the circumstances, the strict application of the United States Sentencing Guidelines in this particular case exposes what United States District Court Judge Jed S. Rakoff warned as: "the utter travesty of justice that sometimes results from the Guidelines fetish with abstract arithmetic, as well as the harm that Guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, No. 05-cr-00325-JSR (S.D.N.Y.)

In departing from an advisory guideline range of 360 to life to a sentence of incarceration of 60 months in the case of *United States v. Lennox Parris*, 05-cr-0636-FB (E.D.N.Y.) Senior District Judge Frederic Block reflected that "it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance. My search for more relevant guidance, therefore had to proceed in other directions, although I would have much preferred a sensible guideline range to give me some semblance of real guidance." In the case of Scott Rothstein, it is respectfully submitted that guidance comes from, as mandated by the Supreme Court, a review of the relevant factors under 18 U.S.C. § 3553 and, in particular, a comparison of other relevant sentences in comparable cases nationwide.

**III.**

**APPLYING THE RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a)**

**A.** **Nature And Circumstances Of The Offense**

Mr. Rothstein fully acknowledges that his crimes were extensive in their scope, substantial in their amount, borne out of personal greed and ego and caused great economic damage and collateral harm to numerous people. Mr. Rothstein is also mindful that by betraying his trust as an attorney and abusing the integrity of the courts, he has not only brought shame upon himself, his former firm and its members, but has damaged the public's trust in the legal profession. Mr. Rothstein acknowledges that he not only stole other people's monies, he also

used it to corrupt the political process and enhance his power for personal gain.  While Mr.

Rothstein did not intend or envision the extent to which the individuals and the entities he dealt

with "layed off" their investments by having numerous others participate, it does not in any way

excuse or lessen his level of guilt.  Similarly, the fact that Mr. Rothstein dealt with mostly people

of significant means, some of whom have absorbed their losses better than others, does not in

any way minimize the seriousness of his crimes.  The nature and circumstances of the offense

weigh heavily in favor of a substantial sentence.  Consequently, Scott Rothstein deserves and

expects to receive a lengthy sentence.

In a similar vein though, much has been made about the manner in which Scott Rothstein

lived his life.  No doubt, his ostentatious behavior, outrageously obsessive materialism and "in

your face" public persona have contributed to, if not been the primary cause of, the

unprecedented intensive media coverage and public vilification of Mr. Rothstein.  Had Mr.

Rothstein conducted his affairs more privately and been more discrete in displaying his wealth,

no doubt the level of public scorn and schadenfraude would be considerably less (as in the case

of the alleged architects of the Mutual Benefits fraud which ironically involved greater losses to

investors, but has yielded hardly any media attention by comparison).  Yet, regardless of one's

personal style, outlandish or not, the net effect on the victims of one's crimes is not altered.  A

loss is a loss, a fraud is a fraud.  The point is that the sentence that Mr. Rothstein deserves should

be based on the gravity of his crimes rather than disapproval of his lifestyle.[6]

---

[6]   The adage, the "bigger you are, the harder you fall" is often descriptive of life but finds no support in 18 U.S.C. §
3553.

B.    **HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

1.    **Pre-Offense Conduct**

Considering the nature and scope of Mr. Rothstein's crimes, it is particularly striking that he lived a normal childhood and a productive law-abiding life[7] up until the time he undertook his criminal acts at age 43.   As referenced in the PSR, he grew up in a loving, tight-knit family, albeit with economic challenges.   Perhaps his meager beginnings inspired his drive to achieve, succeed, and ultimately accumulate vast amounts of material possessions. He achieved success scholastically, proudly obtaining his law license and then embarked on a successful legal career with the dream of one day building his own substantial law firm.   It has become fashionable these days to demonize Mr. Rothstein and find only the worst things to say about him.   No one, save for close family, dare step up to support him publicly for fear of being tarnished by association, or out of fear of reprisal.[8] Yet, the record is clear that Mr. Rothstein unselfishly gave to charitable causes in the community long before his "false wealth" enabled him to bequeath giant contributions.   Mr. Rothstein gave back to his community long before the first dollar of ponzi money ever hit his account.   He participated in worthy causes long before anyone could claim it served any ulterior purpose.

Most telling, is the unselfish act of kindness exhibited by Mr. Rothstein's de facto adoption of Charles Blades, III, the son Alfred Blades, cousin of former NFL player Brian Blades, Jr., who was tragically shot and killed by Brian.   After the ordeal, Mr. Rothstein served literally as a father figure, spending a significant amount of time with Charles, advising and guiding him, employing him, and at times supporting him, always out of a genuine caring

---

[7]   Attached as Composite Exhibit "D" are relevant letters from family and friends.
[8]   In light of publicly disclosed information that Mr. Rothstein cooperated against significant organized crime figures and is currently "housed in protective custody", it is not unreasonable for people to be reluctant to be linked to him in any fashion.

affection and the bond that grew between them.  Charles has been quoted as saying, "he is the father figure I never had in my life.  From the time I was 11 until now he never shown me a bad side.  I'll love him until the day I die."[9]

### 2.    Defendant's extraordinary post-offense conduct

On October 30, 2009,  while a select few individuals began learning of the existence of and magnitude of his ponzi scheme, Mr. Rothstein was ensconced in Morocco, a jurisdiction with no extradition treaty with the United States, with approximately 16 million dollars  in liquid funds at his disposable and the ability to convert additional assets into cash.[10]  He was clearly in a position to avoid U.S. jurisdiction and live out his life very comfortably in a locale that, despite popular misconceptions, offered him substantial business opportunities and a continued lavish lifestyle. It would have been simple to have his immediate family, especially his wife, join him there accompanied by her millions of dollars of jewelry. Even without psychic powers, Scott Rothstein was certainly intelligent enough and experienced enough as an attorney to recognize that to return to the United States and confront his crimes would likely result in very lengthy incarceration, financially and emotionally destroying himself and his family,  and being forced to confront unbearable shame and humiliation in front of all who admired and personally depended on him.  Yet, return is exactly what he did.

One wonders how many of persons faced with the same choice could honestly say that they would have made the same decision as Mr. Rothstein, to return and face the inevitable consequences.  His decision to do so was not complicated, despite how complicated his life had become at that point.  Regardless of how devious and dishonest he had become, and how far he had strayed from  the principles of his upbringing and his faith, Scott still retained some

---

[9]   Sun Sentinel, January 27, 2010, "Adopted son of Scott Rothstein:  'I didn't see this coming'", by Michael Mayo, News Columnist.
[10]   Mr. Rothstein had in his possession his watch collection worth several million dollars.

semblance of honor and integrity, which made it easier for him to do the right thing.  He authorized undersigned counsel to reach out to the United States Attorney and arrange for Mr. Rothstein to be met upon landing on U.S. soil by federal agents in whose company, as it turned out, he would remain for more than one month while he was debriefed around the clock and participated in numerous undercover operations. In that moment of decision to return, Mr. Rothstein set upon a course,  which continues through today, to do everything conceivably possible to "right his wrongs", seek redemption, make restitution to his victims, and aid the United States Government in bringing to justice those others who bear criminal responsibility in this and other matters.  It is respectfully submitted that it would be appropriate for this Court to favorably recognize Mr. Rothstein's voluntary return in its sentencing decision.  Not to do so would discourage others faced with a similar decision in the future from making the right choice.

    The  nature  and  extent  of  Mr.  Rothstein's  substantial  cooperation  with  the  federal authorities will not be detailed here. Nor will it be the basis <u>at this time</u> of any motion by the Government for a downward departure, or otherwise to reduce his sentence.  Instead, it is anticipated that these issues will be addressed at a later time.

    However, Mr. Rothstein's decision to reveal all of the various and intricate details of his criminal activity, coupled with the hundreds of hours spent with Government representatives detailing every nuance of the scheme, pointing out the existence of and location of critical records, saved an untold amount of money and hours of Government time and resources which would  have  been  necessitated  had  Mr.  Rothstein  not  been  so  forthcoming.   Likewise,  his immediate decision to identify and turnover to the Government all of his available assets[11] through a consent forfeiture long before any charges were filed also saved the Government

---

[11]    The value of which is conservatively estimated  at over $50 Million.

valuable time and resources and will facilitate the Government's ability to make meaningful restitution to legitimate victims.

Despite his keen desire to do so, Mr. Rothstein's ability to assist his victims in seeking recovery in the various actions against him and others has been naturally hampered by the very nature of his ongoing cooperation with the federal authorities. Nevertheless, as further evidence of his genuine remorse and commitment to redress his wrongs, Mr. Rothstein has, through undersigned counsel, carefully provided valuable information to various victims' representatives which has enabled them to more effectively pursue claims and recover assets. For example, Mr. Rothstein has provided, through undersigned counsel, valuable information on numerous occasions to William Scherer, counsel for one of the largest groups of claimants/victims, and Chair of the Bankruptcy Creditors Committee. In his attached letter to the Court (Exhibit "E"), Mr. Scherer writes:

> "Mr. Rothstein has cooperated in providing accurate, useful, and trustworthy information that has allowed us to make significant inroads that will not only benefit the innocent victims I represent, but will also benefit the entire creditor body at-large. I genuinely believe Mr. Rothstein is intent on helping to assist and fulfill his express promise to make all legitimate investors whole."

Similarly, through undersigned counsel, Mr. Rothstein has provided "significant", "useful" information to the Trustee in the Bankruptcy matter which has already facilitated one tentative settlement to recover assets for the Bankruptcy Estate and is anticipated to be helpful in other recovery actions as well. The Trustee, Herbert Stettin, in his attached letter (Exhibit "F") writes:

> "Mr. Rothstein has provided me and my advisors certain information that has been helpful and which we expect will continue to be helpful regarding claims which I have and will assert against third parties. In one instance, information provided to me by Mr. Rothstein has contributed to a favorable agreement in principle to settle a pending adversary proceeding."

14

Mr. Rothstein remains steadfastly committed to assisting all legitimate investors and claimants to the extent practicable under the circumstances.  Undersigned counsel respectfully submits that Mr. Rothstein's post-offense conduct has been exemplary, demonstrating significant remorse and rehabilitation and requests that it be factored heavily in this Court's sentencing decision.

It is respectfully submitted that even under a Guidelines analysis, Mr. Rothstein's extraordinary post-offense conduct would also be deserving of a "downward departure" under U.S.S.G. § 5K2.0, especially in consideration of the arithmetic anomaly referenced above, effectively denying him any credit for acceptance of responsibility under § 3E1.1(a) and §3E1.1(b).

**C.**   **The Need To Protect The Public From Further**
         **Crimes By The Defendant – Specific Deterrence**

The need for specific deterrence does not require any sentence greater than recommended herein.  Once released, after a significant number of years separated from society, Mr. Rothstein will, simply put, be in no position to defraud others, or manipulate the Courts or the political system.  In fact, given the unique nature of his cooperation with the Government, he expects to be "monitored" by the Government for the remainder of his life.  As Senior United States District Judge Jack B. Weinstein stated in his Sentencing Opinion in *United States v. Eric Butler*, 08-cr-370 (Eastern District of New York, January 22, 2010) "specific deterrence is achieved through incapacitation."  Subject to astronomical restitution and forfeiture orders, broke and with few, if any, friends left, shamed, his reputation destroyed, stripped of his legal profession, his credibility as a businessman obliterated and likely still hunted as a result of his cooperation with

authorities, Scott Rothstein will pose no risk of harm to others.  In addition, considering his age, recidivism is highly unlikely.

**D.      The Need To Provide Adequate Deterrence Of Others – General Deterrence**

To suggest that the prospect of a 30-year sentence is not enough to deter others who would consider engaging in such conduct ignores common sense.  Such a sentence unequivocally sends a clear message that involvement in these types of crimes will be dealt with severely. There is no need to sentence people to terms which cannot ever realistically be served. Effectively taking away the best years of one's life or, in some cases, the remaining years, is more than enough incentive to the rest of us to steer clear of the prohibited conduct.  "There is considerable evidence that even relatively short sentences can have a strong deterrent effect on white collar offenders.  See *Adelson*, supra at 514.  18 U.S.C. § 3553(a) commands that the sentence be only "sufficient, but not greater than necessary to fulfill the purposes of sentencing."

**E.      The Need To Avoid Unwarranted Sentence Disparities Among Defendants
         With Similar Records Who Have Been Found Guilty Of Similar Conduct**

The importance of this factor to be taken into consideration under 18 U.S.C. § 3553(a)(6) cannot be overemphasized.  In principle, it expresses the primary goal behind the enactment of the Federal Sentencing Guidelines as established by the Sentencing Reform Act of 1984, which was to achieve "certainty and fairness" in the Federal Sentencing process by eliminating "unwarranted disparity" among sentences for similar defendants committing similar offenses.  In practice, it requires that sentencing judges "even in fulfilling their primary duty of rendering just sentences with an eye toward the particular circumstances before them…must be mindful of the

general goal, however elusive, of National consistency." *United States v. Wills*, 476 F3d 103, 109 (2nd Cir. 2007).

It is admittedly an imperfect science to conduct an in-depth analysis of sentences in comparable cases nationwide, as no two cases are identical and there are always factors, not easily revealed in court documents, which impact sentencing decisions. Nevertheless, sentencing courts have analyzed sentences nationwide in an attempt to follow the dictates of 18 U.S.C. § 3553(a) and achieve some consistency in sentences. In *United States v. Parris*, supra, in August 2008, Senior District Court Judge Block in his Sentencing Memorandum and Statement of Reasons listed the following chart of sentences for major fraud defendants who did not cooperate:

| Name | Amount of Loss | Sentence |
|------|----------------|----------|
| Bennett | $100 million | 14 years |
| Ebbers | Over $100 million[12] | 25 years |
| Rigas (John) | Over $200 million | 15 years |
| Rigas (Timothy) | Over $200 million | 20 years |
| Skilling | Over $1 billion | 24 years |
| Forbes | Approx. $14 billion | 10 years |
| Kumar | $2.2 billion | 12 years |
| Ferrarini | $25 million | 145 months |

---

[12]   Although the loss was simply stated as over $100 million, presumably because any loss over the sum represented the out limit for the loss enhancement under the applicable guidelines at that time, the loss occasioned by Ebbers, as CEO of WorldCom, with 2.9 billion shares of stock outstanding was $2.2 billion. *See United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006).

Of course, of note are defendants Skilling (Enron) and Ebbers (WorldCom), responsible for two of the largest frauds in United States history, which had far reaching impact on the public as a whole and the entire financial system.   Specifically, the Enron (Skilling) Fraud led to the collapse of the largest company of its kind in the world, wiping out the pensions and investments of thousands of employees and investors.

Undersigned counsel[13] recently conducted an analysis of major fraud cases nationwide involving fraud and/or loss amounts in excess of $100 Million, which is attached hereto as Exhibit "G".   This analysis includes 30 sentenced cases involving 40 individuals defendants and lists an additional nine cases involving 12 individual defendants pending sentencing.   With the exception of 5 cases, those of defendants Brandau, Madoff, Petters, Weiss and Pound, none of the sentences imposed nationwide exceeded a prison term of 30 years and most were substantially less.   Mr. Madoff's case, of course, is unique, not only in its scope, but in the unmatched amount of fraud (over $50 Billion) which dwarfs all the other 39 cases combined. Messrs. Brandau, Petters and Pound forced the Government into lengthy trials and Mr. Weiss fled to Austria while the jury was deliberating and was sentenced *in absentia* to 845 years.   By comparison, cases more analogous to Mr. Rothstein's, in the amount of fraud and the entry of a guilty plea, routinely produced lower sentences than that recommended here.

In an effort to compare "apples to apples" reference is made to the case of *United States v. Marc Dreier*, 09-cr-00085-JSR (Southern District of New York).   Mr. Dreier's case is eeringly similar to Mr. Rothstein's.   Raised in a loving home environment, excelling scholastically, and achieving his law degree, Mr. Dreier lead a productive, law-abiding life, and embarked upon the goal of growing his small practice into a powerhouse national law firm.   In the process he orchestrated and conducted a massive ponzi scheme using promissory notes (which is how Mr.

---

[13]   Credit must actually be given to Paralegal, Maribel Matiska.

Rothstein began) and illicitly amassed great personal wealth exhibited by numerous high-ticket material possessions such as, homes, boats, cars, etc. until his scheme came crashing down by its sheer weight with the final dénouement taking the form of his capture by Canadian authorities while he was desperately trying to impersonate a banker.  Not only were the circumstances of his case nearly identical to Mr. Rothstein's, but his loss/restitution figures are substantially similar.[14] After conducting a thorough analysis of all of the factors relevant to sentencing including reference to the Guidelines, United States District Court Judge Rakoff sentenced Mr. Dreier to 20 years imprisonment noting that the sentence was "sufficient but not more than necessary" to satisfy the requirements of sentencing.

In fairness, it should be noted that while Mr. Rothstein's ponzi scheme was amazingly similar to Mr. Dreier's, Mr. Rothstein did engage in acts of political corruption and did, in an attempt to further his ponzi scheme forge, or caused to have forged, Federal Judge's signatures on false purported court documents.  Thus, in recognition of his additional culpability, Mr. Rothstein acknowledges that he deserves, and undersigned counsel has recommended he receive a lengthier sentence than that of Mr. Dreier.

Of course, it should also be noted whereas Mr. Dreier was caught red-handed in Canada, and even after his arrest, attempted to secrete $10 Million of assets, as noted above, Mr. Rothstein, voluntarily returned from a non-extraditable jurisdiction and began immediately cooperating with authorities turning over all of his assets to the Government.

---

[14]   Loss:  Over $400 Million; Restitution:  $389 Million.

## <u>CONCLUSION</u>

It is respectfully submitted, that when all the relevant factors under 18 U.S.C. § 3553(a) are taken into account, the interest of justice are best served by a sentence of imprisonment of 30 years which is "sufficient, but not more than necessary" to satisfy the purposes of sentencing. Such a sentence is sufficient to promote proper respect for the law and punish Mr. Rothstein adequately for his serious crimes.

Respectfully submitted,

LAW OFFICES OF MARC S. NURIK
One East Broward Boulevard
Suite 700
Fort Lauderdale, FL  33301
Tel.: 954-745-5849
Fax: 954-745-3556
marc@nuriklaw.com

By:    s/Marc S. Nurik
      MARC S. NURIK
      Fla. Bar No. 272817

<u>**CERTIFICATE OF SERVICE**</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed and furnished by transmission of notice of electronic filing generated by CM/ECF and by U.S. Mail to: Jeffrey Kaplan, Assistant United States Attorney, Paul F. Schwartz, Assistant United States Attorney, and Lawrence D. LaVecchio, Assistant United States Attorney, 500 East Broward Boulevard, Suite 700, Fort Lauderdale, FL 33394 this 4th day of June, 2010.

　/s/ Marc S. Nurik　　　
MARC S. NURIK