```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      FORT LAUDERDALE DIVISION
                        CASE NO. 09-60331-CR-COHN
 3

 4    UNITED STATES OF AMERICA,        Fort Lauderdale, Florida

 5                   Plaintiff,        June 9, 2010

 6            vs.

 7    SCOTT W. ROTHSTEIN,

 8                   Defendant.        Pages 1 - 65

 9    -----------------------------------------------------------

10

11                       SENTENCING HEARING
                 BEFORE THE HONORABLE JAMES I. COHN
12                  UNITED STATES DISTRICT JUDGE

13
      APPEARANCES:
14

15    FOR THE GOVERNMENT:    LAWRENCE LaVECCHIO, ESQUIRE
                             JEFFREY KAPLAN, ESQUIRE
16                       .   PAUL SCHWARTZ, ESQUIRE
                             ASSISTANT UNITED STATES ATTORNEY
17                           500 E. Broward Boulevard, Seventh Floor
                             Fort Lauderdale, Florida 33394
18

19    FOR THE DEFENDANT:     MARC NURIK, ESQUIRE
                             One E. Broward Boulevard, Suite 700
20                           Fort Lauderdale, Florida 33301

21
      REPORTED BY:           TAMMY NESTOR, RPR
22                           Official Court Reporter
                             299 E. Broward Boulevard, Room 203G
23                           Fort Lauderdale, Florida 33301
                             (954) 769-5496
24                           Tammy_Nestor@flsd.uscourts.gov

25
```

1           THE COURT:  The matter before the Court is the United

2      States of America versus Scott W. Rothstein.  This is case

3      No. 09-60331-CR.

4           Mr. Rothstein is present represented by Marc Nurik.

5           The government is represented by Assistant United

6      States Attorneys Lawrence LaVecchio, Paul Schwartz, and Jeff

7      Kaplan.

8           On January 27 of this year, Mr. Rothstein entered a

9      plea of guilty to Counts 1 through 5 of a five-count

10     information.  Count~1 charged RICO conspiracy, Count~2 charged

11     conspiracy to commit money laundering, Count 3 charged

12     conspiracy to commit mail and wire fraud, and Counts 4 and 5

13     charged wire fraud.

14          Upon acceptance of Mr. Rothstein's plea, the Court

15     adjudged him guilty of Counts 1 through 5, ordered a

16     presentence investigation report, and deferred sentence until

17     today's date.

18          Have counsel for the respective parties received a

19     copy of the presentence report?

20          Mr. LaVecchio?

21          MR. LaVECCHIO:  We have, Your Honor.

22          THE COURT:  Mr. Nurik?

23          MR. NURIK:  Yes, Your Honor.

24          THE COURT:  Mr. Rothstein, have you received and

25     reviewed a copy of the presentence report?

 1          THE DEFENDANT:  I have, Your Honor.

 2          THE COURT:  Are there any objections to the report?

 3          MR. NURIK:  There are none, Your Honor.

 4          THE COURT:  The Court makes the following findings

 5   with respect to the advisory guidelines:

 6          The total offense level is 43.  The criminal history

 7   category is 1.  The prison range, since the advisory guidelines

 8   of life exceed the statutory maximum of 100 years, the

 9   guidelines are limited to 100 years or 1200 months.

10          Probation is not authorized.  The supervised release

11   range is two to three years.  The fine range is $25,000 to

12   $858,550,937.  Restitution has not been determined at this

13   time.  The Court will address that later.  And there is a

14   mandatory special assessment of $100 per count for a total of

15   $500.

16          The Court has received and reviewed the sentencing

17   memoranda which were filed on behalf of both parties.  Before I

18   hear from the lawyers, I would like to know whether there are

19   any victims who wish to be heard.

20          All right.  I see one hand in the back.  Ma'am, you

21   can step forward, please.  I want you to come up here to the

22   podium.

23          Ma'am, would you please identify yourself.  Give us

24   your name.

25          THE WITNESS:  My name is Shirley Denise Blaze, and I

1    live in Miami, Florida at 2465 Northwest 162 Street, Your

2    Honor.

3              THE COURT:  Okay.  And you were a victim of this crime

4    or you just wish to be heard?

5              THE WITNESS:  I just wish to be heard, please.

6              THE COURT:  I'll go ahead and hear from you now,

7    ma'am.

8              THE WITNESS:  I just want to tell my brother, my

9    brother, may God bless you.  May God bless you.  That's it.

10             THE COURT:  Thank you very much for your comments.

11             Sir, you can step forward.

12             All right.  Please give us your name.

13             THE WITNESS:  Yes.  Good morning, Your Honor.  My name

14   is Steven Batone.  And I was a client of Scott Rothstein's,

15   represented personally by Mr. Rothstein, himself.  And I don't

16   know where to begin.

17             Mr. Rothstein was my attorney for four years.  I had a

18   case against the City of Plantation.  I had a settlement

19   agreement that was confirmed by the city's attorneys.  And

20   Mr. Rothstein just sat on it.  I went to see him every month

21   for four years, and he just told me lies.

22             It's just -- I can't believe it.  You trust your

23   attorney.  You put your faith in him.  And I just -- it's -- I

24   just want everybody to know that it's not just the investors.

25   The investors are secondary.  The client, as you know being a

1    judge and all the attorneys here, the client comes first

2    without a doubt.

3            And now I have been out of work for almost three years

4    now.  I can't get another job.  I had a binding settlement.  I

5    had the city -- they were in agreement.  They were going to pay

6    the settlement.  And Mr. Rothstein never acknowledged it.  He

7    never let me know about it.  And now the insurance company,

8    Carolina Casualty, doesn't want to pay.  They are contesting it

9    now.  And it's a mess.

10           THE COURT:  Sir, have you filed a third party claim?

11           THE WITNESS:  Yes, I have retained another attorney

12    and he's filed a third party claim.

13           THE COURT:  And how do you spell your last name?

14           THE WITNESS:  B-I-T-T-O-N.  And he's basically told me

15    that there's like a one percent chance of getting anything.

16    And it's just inexcusable that the insurance company gets away

17    with it, the City of Plantation gets away with it, and me, the

18    client, I've got nothing.  And I just want the Court to know

19    and everybody to know here the situation.  I've got all the

20    supporting documentation also.

21           THE COURT:  Sir, thank you very much for your

22    comments.

23           THE WITNESS:  Thank you, Your Honor.

24           THE COURT:  Any other victim wish to be heard?

25           All right.  Mr. Nurik, I will hear from the defense.

 1          MR. NURIK:  Good morning, Your Honor.

 2          THE COURT:  Good morning.

 3          MR. NURIK:  Some day they will invent a podium that

 4   you can actually use.

 5          Your Honor, I have, as you have I'm certain and as the

 6   government has, given a lot of thought to how we would proceed

 7   today and what we would say today.  And no doubt, given the

 8   magnitude of this case, this Court's decision will clearly

 9   resinate beyond this courtroom and beyond this day.

10          I am sure this Court, mindful of that, clearly intends

11   this decision, your decision, to resonate as an example of

12   justice, reason, rule of law, not the rule of the mob, not

13   influenced by the media, not influenced by the frenzy that this

14   case has unfortunately inspired.

15          Coming into this courtroom, there were only three

16   things I was sure of.  The first is that I would get a seat,

17   the second is that you will sentence my client, I am certain

18   knowing Your Honor, for who he is, not for how he's been

19   demonized, for what he's done, viewing it coolly and

20   rationally.

21          And the second thing -- the third thing is that you

22   will not make a final decision, as much as you may have come

23   onto the bench predisposed to a particular sentence, until you

24   have given us the opportunity to speak and to point out the

25   reasons why we believe a sentence, a particular sentence, is

1    appropriate.

2         What makes this case particularly unique is, as we

3    stand here today, the government and the defense agree on much.

4    In fact, we agree on just about everything except what is the

5    appropriate sentence in this case.  We agree on all of the

6    facts no matter how much the government points out to the Court

7    how serious or egregious the crimes that Mr. Rothstein

8    committed, Mr. Rothstein by his own admission in his letter to

9    Your Honor candidly admits all of those facts and more.

10        In this particular case, it's just a question of how

11   much sentence is sufficient but not more than necessary, which

12   are the catch words under the sentencing law, to promote the

13   purposes of sentencing.

14        The government has recommended a 40-year sentence.  We

15   have recommended a 30-year sentence.

16        Now, in this particular case, as in all cases, the

17   Court must start its analysis by looking at the guidelines.

18   And looking at the guidelines in this case, we find that the

19   defendant's guidelines, as Your Honor has as stated, are life

20   according to the book, but in practicality cannot exceed the

21   statutory maximums, which would be a hundred years.

22        In its memo to the Court, the government talked about

23   the Rita case, the supreme court case of Rita versus United

24   States.  And in Rita, it talks about how the law provides that

25   an appellate court in reviewing the sentence of a district

 1    court under the guidelines may presume reasonableness.

 2            If you look at Rita carefully and if you look at the

 3    following cases after Rita, Gall versus United States and

 4    Nelson versus United States, what they say that's relevant to

 5    this Court is that in doing so, the district Court, in

 6    reviewing the sentencing, may not presume that the guidelines

 7    are reasonable.  That is the law.  For purposes of our analysis

 8    today, this Court may not presume that the guidelines are

 9    reasonable.

10            According to Gall versus United States, found at 552

11    United States, 2007 decision, the guidelines should be the

12    starting point, the initial benchmark.  They are not the only

13    consideration, however.

14            Accordingly, after giving both parties an opportunity

15    to argue for whatever sentence they deem appropriate, the

16    district court should then consider all the 3553(a) factors to

17    determine whether they support the sentence requested by a

18    party.  In so doing, the Court may not presume that the

19    guideline range is reasonable.  The Court must make an

20    individualized assessment based on the facts presented.

21            Now, in this particular case, the problem with the

22    guidelines is that they, as have been found in certain other

23    cases, run amuck, are unreasonable, are irrational as applied.

24            Now, we have given the Court in our memo a number of

25    reasons for that.  And in particular what we are concerned with

1    is the fact that, in viewing what is an appropriate sentence,

2    if you use the guidelines as the initial benchmark and then

3    presume any form of reasonableness, then when you look at the

4    sentences that the Court has available to it, those sentences

5    are guided by what the upper range would be as a hundred years.

6    And if that upper range is reasonable, then the Court starts

7    with that and goes down appropriately if there are any

8    adjustments.

9            We are submitting to the Court that you literally have

10   to throw out the hundred-year range as a reasonable guide.  And

11   in particular, we point out, number one, the way that the

12   guidelines are calculated which are driven by the adjustment

13   for the loss in this particular case which is in excess of

14   $400 million provide a 30-point adjustment upward.

15           And as we provided to you by the charts that we have

16   given you, that simply dwarfs by two to three times most of the

17   other adjustments within the guidelines.  And this was a

18   congressional response under the Sarbanes Oxley Act to what was

19   going on with Enron, what was going on with all these other

20   cases that have had occurred that forced a legislative

21   response.

22           Now, the beauty of our system, and I don't mean to

23   make this a civics lesson, is that there is a separation of

24   powers.  And sometimes legislature acts out of political

25   expediency.  For whatever reason, the courts are there as a

```
 1    check.  And in this particular situation, what we have is an

 2    upward adjustment that is so substantial that it effectively

 3    renders every case, every major fraud case today in excess of

 4    $200 million as an automatic life sentence case.

 5           And when you look at it, it's very simple to

 6    understand that.  What you've got is you've got -- in our case

 7    you've got 7 points as the initial adjusted level, you've got

 8    30 points just based solely on the number of loss.  That's 37

 9    already.

10           You've got 2 points for sophisticated means.  I'm sure

11    Your Honor is aware that there probably has never been a fraud

12    case in recent history where sophisticated means isn't

13    automatically granted, applied.

14           And then you've got points for the number of victims.

15    Now, unless someone is defrauding Bill Gates, typically in any

16    major fraud case of this level, there are numerous victims.  So

17    automatically without even considering adjustment for role in

18    the offense or anything else, you are at life, you are at

19    mandatory life.

20           And if congress had intended that, what congress could

21    have done is simply created statutes like existed in the past

22    concerning the drug statutes that pegged mandatory sentences

23    based on the amount of loss.  But congress did not intend that.

24           The unintended result of what congress did is to

25    create an irrational result in these types of sentences.  What
```

1    makes it even more irrational as applied in this case is it

2    winds up not giving credit for acceptance of responsibility.

3            And when you think about that, that's a particularly

4    absurd result because the way the system is designed, as Your

5    Honor knows being a state judge and being a federal judge, is

6    that we do award credit and we specifically award credit in the

7    federal system for someone who saves the Court and the

8    government time and money in not going to trial and pleading

9    guilty early.  And there's usually a three-point reduction if

10   you've done it early enough.

11           And typically under the guidelines, according to all

12   of the authorities, that usually results in a 25- to 30-percent

13   reduction under the guidelines.  But when you automatically

14   calculate the guidelines by the numbers at 52, which is what

15   they are calculated here as we have explained, and you reduce 3

16   points for that, you are still well above the 43-point maximum

17   for life.

18           So, in effect, Mr. Rothstein or anyone similarly

19   situated has no incentive to plead guilty and to do the things

20   that are part of the acceptance of responsibility measure under

21   the guidelines.  And under those circumstances, I would submit

22   the guidelines are irrationally applied in this particular

23   case.

24           And, of course, we have pointed out to the Court the

25   comparison between how the guidelines work in major fraud cases

1  based on this adjustment and the average sentences in the

2  United States in 2006, 2007, 2008, and 2009 for serious crimes

3  of violence including murder, kidnapping, rape, terrorism.

4  Those crimes are punished on the average significantly less

5  severely than the guidelines provide for major fraud cases.

6        Now, in no way am I suggesting major fraud cases

7  should be dealt with in any lenient fashion.  I don't want the

8  Court to misunderstand me.  I totally agree with the concepts

9  that have been espoused by the government and the case law that

10 when one coolly and rationally decides to commit a crime, that

11 is a very serious, serious, serious crime.

12        But nevertheless, what we wind up with is as has been

13 described by the district courts and in particular I have cited

14 the Court to the Adelson decision in my memo, and I think the

15 language that the judge uses in the Adelson decision is quite

16 instructive, the utter travesty of justice that sometimes

17 results from the guidelines fetish with abstract arithmetic as

18 well as the harm that the guideline calculations can visit on

19 human beings if not cabined by common sense.

20        And in that decision, Judge Rakoff, District Court

21 Rakoff in New York, said, but whereas here the calculations

22 under the guidelines have so run amuck that they are patently

23 absurd on their face, a court is forced to place greater

24 reliance on the more general consideration set forth in Section

25 3553(a) as carefully applied to the particular circumstances of

 1    the case and the human being who will bear the consequences.

 2         And in another instructive decision, also a district

 3    court decision, United States versus Parris which I cite to the

 4    Court, in that particular case the judge said, it is difficult

 5    for a sentencing judge to place much stock in a guideline range

 6    that does not provide realistic guidance.

 7         My search for more relevant guidance, therefore, had

 8    to proceed in other directions; although, I would much prefer a

 9    sensible guideline range to give me some semblance of real

10    guidance.

11         So where this leaves us is looking at the guidelines

12    in this case initially and realizing that they don't really

13    provide us the basis for guidance or comparison.  And instead,

14    we look at what the courts -- what the supreme court mandates

15    are the factors under Section 3553.  And of course this has all

16    been guided by the more recent decisions of the supreme court

17    and in particular Booker which makes the guidelines no longer

18    mandatory and now emphasizes Sections 3553(a).

19         So in looking at Section 3553(a), the first thing that

20    I would like to address to the Court is the nature and

21    circumstances of the crime.

22         Without question, it was egregious.  Without question

23    it was lengthy in its time period.  It was roughly five years.

24    There are numerous victims in many ways.  It has had a profound

25    effect on the community.  And it deserves a serious lengthy

 1   sentence.  There is no doubt about that, and Mr. Rothstein has

 2   pointed that out to Your Honor in his letter.

 3         The second factor which is the history and

 4   characteristics of the defendant, Mr. Rothstein has spent 43

 5   years of his life as a law abiding productive member of

 6   society, as a caring, loving person.  It is unusual for me and,

 7   I'm sure, for Your Honor to be in the sentencing in a case of

 8   this magnitude and not to be able to see the defense present

 9   any witnesses.  And there's a very simple reason for it.

10         There is not one person that I can ask to step

11   forward, and believe me there are many who could but would not

12   simply because of the fear of public vilification that would

13   exist.  The amount of media coverage in this case has been

14   unprecedented, the vilification of family members, the

15   demonization of family members.  Just the mere association with

16   Mr. Rothstein guarantees someone a place in the Boston Sentinel

17   or the Miami Herald.

18         There is also on the part of certain people a fear of

19   reprisal.  As the Court notes, Mr. Rothstein's cooperation with

20   the United States government and participation in certain

21   particular investigations which we will not elaborate on

22   here --

23         THE COURT:  Let me ask you this question:

24         Why do you think this case has engendered so much

25   public attention?

```
 1          MR. NURIK:  Well, Your Honor, I can only speculate,
 2   but I'll tell you the reasons I think.  I'm not sure I really
 3   know the answer.  I'm not sure anybody knows the answer.
 4   Because we have all seen high profile cases in south Florida.
 5          In the '80s I was involved as a trial lawyer in the
 6   River Cops case which was a high profile case but did not
 7   engender anything close to the magnitude of coverage.
 8          I think part of it is clearly that Mr. Rothstein lived
 9   larger than life, that Mr. Rothstein was a very brash, very
10   vocal member of this community.  His face was plastered on
11   every society magazine.  In a short period of time, he became
12   one of the, according to one magazine, 25 most influential
13   people in Broward County.  He owned restaurants.  He owned
14   businesses.  He was everywhere doing everything.  And that
15   created, I think, a public persona that in this particular town
16   may have been unprecedented.
17          And I believe that given that, that once all these
18   crimes that he was involved with have been revealed, it was
19   certainly a matter of public interest, but more so, there was a
20   lot of what we've described as, using a very appropriate German
21   word that's found its ways into the English language,
22   schadenfreude within town.  I mean, there were a lot of firms
23   that, quite frankly, were jealous.  There were a lot of people
24   who couldn't believe, how could this firm, RRA, grow so fast.
25          THE COURT:  The facts that you just alluded to, do
```

```
 1    they fall within the factors of nature and circumstances of the
 2    offense or history and characteristics of the defendant?
 3              MR. NURIK:  They really fall more within the history
 4    and characteristics of the defendant.
 5              THE COURT:  But they are factors that the Court should
 6    consider.
 7              MR. NURIK:  Absolutely.  There's no question.
 8              THE COURT:  Because in reading your memorandum, on
 9    page 10 you state that, the point is that the sentence that
10    Mr. Rothstein deserves should be based on the gravity of his
11    crimes rather than disapproval of his lifestyle.
12              Well, isn't his lifestyle part of the manner in which
13    the crimes were committed?
14              MR. NURIK:  To some degree.  To some degree.  To the
15    extent that Mr. Rothstein did certain things that facilitated
16    the offense, yes.  To the extent, though, that Mr. Rothstein
17    was a popular figure in town, not everything Mr. Rothstein did,
18    not the way Mr. Rothstein dressed, not the way Mr. Rothstein
19    acted, not the way that Mr. Rothstein owned certain businesses,
20    not the way that Mr. Rothstein put himself out there, not the
21    way he conducted himself personally with people was designed to
22    facilitate or promote this scheme, not all the things that he
23    did.
24              I mean, the fact of the matter is, yes, to some degree
25    Mr. Rothstein's participation in the political process,
```

1    Mr. Rothstein's participation in certain things in town clearly

2    were designed to enable him to access certain people, and he

3    even admits that in his letter to the Court.  But not

4    everything he did -- and certainly what has been jumped on by

5    the media has put people in a position of being fearful of

6    coming forward and talking about his good deeds.

7            THE COURT:  But part of the marketing aspect of this

8    crime was based on creating an image, an image of wealth,

9    power, and influence.

10           MR. NURIK:  Yes.

11           THE COURT:  And this opulent lifestyle it would appear

12   to me would be relevant to the 3553(a) factors.

13           MR. NURIK:  Well, when Your Honor looks at -- and I

14   reference later on in my presentation the case of Marc Dreier

15   who is almost identical in every aspect of the way the crime

16   took place.  Mr. Dreier did exactly the same things, only

17   Mr. Dreier may not have been in a community like this one.

18           In fact, he was in New York, in the Big Apple, where

19   what Mr. Dreier did did not have the same effect.  It was not

20   front page news.  He was not on the cover of every magazine,

21   not out of a lack of interest or a lack of desire, just simply,

22   he was in a much bigger pond.

23           Mr. Rothstein was in a much smaller pound.  As a

24   result, by being in a much smaller pond, all the things he's

25   done have been magnified.  That's the point I'm trying to make.

1   It's been magnified.  I'm not trying to suggest to the Court

2   that these things aren't important.

3          THE COURT:  I just wanted to understand your position,

4   that you are not saying that the Court can't consider these

5   facts as being relevant to the 3555(a) factors?

6          MR. NURIK:  No, but I think the Court should look at

7   them in perspective.

8          THE COURT:  I understand.

9          MR. NURIK:  And they have been unduly magnified in

10  this particular locale.  And it's clear from just the amount of

11  coverage, which is unprecedented, I mean, it's been roughly

12  seven months, there have been over 50 front page articles.  Up

13  until maybe a month or two ago, it's been almost a daily thing.

14  It's been resurrected again.  Every newspaper covers it.  Every

15  trade paper covers it.  There are blogs devoted to it.  There

16  are web sites devoted to Mr. Rothstein.  There's a section on

17  the Sun Sentinel front web page that is just the Rothstein

18  section.

19         My point is it has been magnified way beyond

20  proportion.  And as a result, we don't have people here to talk

21  about Mr. Rothstein's good deeds except unexpectedly somebody

22  came forward.  And I was wondering who this woman was.  And

23  then I got it when I heard her last name, Blades.  And as the

24  Court recalls in the memorandum that I provided, the story of

25  Charles Blades, the story of the young man whose father was

1  tragically shot by the cousin of his father, this is a family

2  of professional athletes, NFL players.  He was left literally

3  orphaned.  Mr. Rothstein in effect adopted him in every way

4  conceivable.

5        This wasn't anything that had to do with Mr. Rothstein

6  attracting new investors or facilitating his scheme or for that

7  matter boosting his enormous ego.  It had nothing to do with

8  that.  It was the purest act of unselfish kindness that a human

9  can provide.  And he did so without fanfare.

10       To the extent that I'm able to document it since

11  Mr. Blades is concerned about coming forward in this courtroom

12  as well, I was able to document it because of a column by

13  Mr. Mayo in the Sun Sentinel mentioning it briefly.  But he

14  mentored the boy.  He gave him guidance.  He provided him with

15  financial and emotional support.  He gave him a job, which is

16  the number one form of sadaqa.  He gave him a job.  He gave him

17  an opportunity in life.  And that speaks about who underneath

18  this all this man can be and is capable of being, a man who is

19  redeeming himself, has been redeeming himself since the end of

20  October.

21       There are other acts of kindness out there.  I can

22  tell the Court myself, I have had seen them.  He has provided

23  support for people in terms of getting them into rehab.

24  Unfortunately, these people by coming forward would be putting

25  themselves, given the nature of the magnification of this case,

```
 1    at great personal risk and embarrassment.  And Mr. Rothstein

 2    has said to me, no, I don't want to do that.  I don't want you

 3    to carry anyone on my shoulders here and bring them into court

 4    and put them through that.

 5         Mr. Rothstein's own wife did not write a letter to the

 6    Court and that was picked up by the news media only because

 7    everything that she has done up to this point in time has been

 8    so demonized and magnified.  Some of the things that have been

 9    said about her have been downright cruel.  And the bottom line,

10    as Mr. Rothstein said, I don't want to put her through that.

11         So the nature and the history of this man even in

12    considering the way he lived his life must be balanced by the

13    background he had, the fact that up until five years ago he led

14    a law-abiding, productive life, and he has shown the capacity

15    for kindness, for good, and he is capable of being redeemed.

16         When we look at the issue of specific deterrence,

17    which is one of the other significant factors under 3553(a),

18    what do we find?  We find that the government and the defense

19    agree.  They agree.  The government agrees as set forth in

20    their memo that the sentence that is recommended by the

21    defendant of 30 years is sufficient to produce specific

22    deterrence.

23         And as I have pointed out, Your Honor, he's going to

24    be subject to astronomical restitution forfeiture orders.  He

25    will be broke when and if he's released, few, if any, friends
```

```
 1    left, shamed, his reputation destroyed, stripped of his legal
 2    profession, his credibility destroyed as a businessman, likely
 3    hunted by some, and forever monitored by the government.  He
 4    poses simply no risk of harm.  The sentence of 30 years on the
 5    issue of specific deterrence is more than sufficient but not
 6    more than necessary to protect the public.
 7              Let me talk about the issue of general deterrence.
 8    Arguably this is one of the most fundamental and significant
 9    issues that a court has to deal with in a significant case,
10    certainly a case that is as well-reported by the media and by
11    the legal journals as well.
12              And I would recognize clearly a strong natural
13    predisposition that any court faced with making this particular
14    decision would have to sending a message that harsh punishment
15    deters people who act with a rational, cool mind and,
16    therefore, because they are acting with a rational, cool mind,
17    they are clearly and unequivocally subject to the influence of
18    general deterrence.
19              And, in fact, the government cites a case in its brief
20    that, I think, is very instructive on that for several reasons,
21    and it's the Martin case.
22              And I took a look at the Martin case.  And in the
23    Martin case, the Court said that because economic and fraud
24    based crimes are more rational, cool, and calculated than
25    sudden crimes of passion or opportunity, these crimes are prime
```

1    candidates for general deterrence.

2            We totally agree.

3            The Martin case, if the Court had the opportunity to

4    look at the actual facts of the Martin case, involved a fraud

5    case, a significant fraud case, involving HealthSouth which was

6    a very highly publicized fraud case.  Certain of the key

7    executives including Mr. Squishy who I put in my comparison

8    memo received lengthy sentences.

9            This particular defendant, Mr. Martin, received a

10   sentence of seven days.  And as a result of a seven-day

11   sentence, the court of appeals reversed this sentence holding

12   that it was insufficient to provide for general deterrence.

13           Now, seven days, let's compare that to the sentence

14   that we are asking for in this particular case.  And keeping in

15   mind -- you know, we never actually think about days, but we

16   live our lives by days.  We wake up in the morning, we live a

17   whole day, we go to sleep, and we start again the next day.

18   Our whole life is broken into days.

19           In this particular case, we are asking the Court for a

20   sentence of, not 7 days, but 10,950 days, 10,950 days.  Even

21   with the 85 percent service rate that exists now, meaning that

22   15 percent is chopped off for good time, that's still

23   9300-something days.  That is a significant sentence.

24           And I would respectfully submit to the Court that

25   anyone who is in a position to decide whether or not to commit

1    a crime of this magnitude or even a lessor magnitude and is in

2    a position to be deterred by a substantial sentence would be

3    deterred by a sentence of 10,950 days.  Because if they are not

4    deterred by a sentence of 10,950 days, they are not going to be

5    deterred by any sentence.

6            So I would submit that using, utilizing the concept of

7    sufficient but not more than necessary, that for purposes of

8    general deterrence, the sentence that we are asking for is more

9    than sufficient.

10           Now, I also want to point out that the government

11   requests a sentence of 40 years.  And, of course, reasonable

12   minds can differ.  But the interesting thing about their

13   memorandum is there is no actual reason that is given for the

14   40 versus the 30.  Why 40?  Why not 35?  Why not 38?  Why not

15   43?  Why 40?  Where is the magic to any of these numbers?  We

16   throw out numbers without realizing sometimes the effect they

17   have on human beings.

18           Now, the 40 they ask for is based in part, I guess, on

19   some of the cases that they have referred the Court to which I

20   will deal with in a second.  But in considering general

21   deterrence which is based on the concept that we want to

22   prevent people -- we want to motivate people from doing bad

23   things, inherent in that is the concept we want to encourage

24   people to do good things.  We want to encourage people to do

25   the right thing.

1          And in this particular case, as part of that and also

2   as part of the history and characteristics of the defendant is

3   what we have termed extraordinary post offense conduct.

4          And that is what, Your Honor, I would submit is the

5   single most important factor for this Court to consider in

6   fashioning its sentence.

7          THE COURT:  What 3553(a) factor does that fall within?

8          MR. NURIK:  Well, I would submit, first of all, it

9   falls under -- I would submit, A, it would fall under the

10  section that I've just identified which is history and

11  characteristics of the defendant.

12         THE COURT:  Okay.

13         MR. NURIK:  However, I would also submit that it has

14  its basis in this particular case under general deterrence as

15  well, and I will explain why in a moment.  And I also will

16  submit that it should fall under a catchall provision of the

17  sentencing guidelines to the extent you use a sentencing

18  guideline analysis.  Interesting, Section 5K2.0 specifically

19  prohibits consideration of acceptance of responsibility.  But

20  this goes beyond acceptance of responsibility.  These are

21  factors --

22         THE COURT:  But if you are looking for a downward

23  departure under the guidelines, doesn't this go to cooperation

24  which is covered by 5K1.1?

25         MR. NURIK:  No.

```
 1              THE COURT:  It does not?

 2              MR. NURIK:  No.  I would submit that the one thing we

 3    are not talking about here is Mr. Rothstein's cooperation

 4    against other individuals regarding other crimes,

 5    Mr. Rothstein's active cooperation.  We are not talking about

 6    that.  As I have pointed out in my memo, that is not the

 7    subject of today's proceeding.  That may be the subject of

 8    another proceeding.

 9              THE COURT:  You are talking about the return from

10    Morocco voluntarily without being extradited?

11              MR. NURIK:  Right, the return from Morocco, the

12    sitting down and unraveling of this particular very, very

13    detailed, very complicated financial crime, hundreds of hours

14    in doing that alone, the pointing out of records, the location

15    of assets, the turning over of all of the assets without there

16    being any kind of bargain involved.  And, by the way, as the

17    government --

18              THE COURT:  Could you speak into the microphone so

19    that we can all hear what you have to say.

20              MR. NURIK:  I'm sorry, Your Honor.

21              As the government has pointed out, there was no

22    precondition to Mr. Rothstein's return.  I mean as the Court

23    notes from what we have told the Court, Mr. Rothstein clearly

24    before he was charged with anything, before he was identified

25    by either any public or private entity as having committed
```

```
 1    these crimes, left to Morocco.

 2         He put himself in what would be considered an ideal

 3    situation.  He had $16 million at his disposal liquid.  He had

 4    a watch collection which has been conservatively estimated at

 5    several million dollars.  He had business opportunities there.

 6         Any suggestion that Morocco was not a hospitable

 7    place, and I'm not looking to be a travel guide or travel agent

 8    here, but the two popular movies out there right now, The

 9    Prince of Persia and and Sex and the City were both filmed

10    there.  This is not a place where he could not have survived

11    very well for the rest of his life.  He could have tried to

12    bring his family over there.  He could have put himself in a

13    position of escaping any possibility of U.S. jurisdiction.  Of

14    course, as you know, there's no treaty with Morocco for

15    extradition.

16         Any suggestion that he was at risk, he had plenty of

17    money to secure himself.  Any suggestion that he was in a

18    position where the government would get him, not true.  The

19    fact of the matter is he was set up.  But he came back.  He

20    came back voluntarily.  Nobody asked him to come back, no

21    discussion with the government in advance, no conversation

22    about where he would be when he came back or what he would be

23    charged with.  The U.S. attorney's office plainly states that

24    in their memorandum.  This was a pure voluntary act.

25         Now, if you look at a lot of cases, and I will go
```

1   through this in a minute, of other people sentenced to lengthy

2   sentences for other major financial crimes that the government

3   has referenced and we have referenced in our charts, some of

4   those people actually fled to foreign countries, were actually

5   caught in those foreign countries, and were fighting

6   extradition from those foreign countries.  In fact, one

7   particular person's sentence could only be a certain amount

8   because the treaty with that foreign country only allowed a

9   sentence of a certain number of years.

10          In this particular case, none of those factors exist.

11   In fact, in none of the cases that we can find anywhere

12   involving a major financial crime since the '90s or maybe even

13   earlier, but we haven't been able to look that far back, do we

14   see this particular exceptional circumstance.  And then when he

15   comes back, he comes back -- he's not psychic, he may not be

16   prescient, but he's certainly smart enough to understand that

17   you are coming back to potential life in prison, to destruction

18   of yourself, your family, shame and humiliation beyond measure,

19   all of which he admittedly deserved, but he could have avoided

20   that, and he came back to that.

21          He had no freedom.  Without going into any detail, I'm

22   sure the Court can surmise there was never a moment of freedom

23   from the moment he came back.  From the moment he came back, he

24   did everything conceivably possible to try to undue what he had

25   done.

```
 1              Now, I was searching the other night for a quote about

 2     undoing the past.  You know, we trial lawyers we like to look

 3     for quotes sometimes.  I couldn't find a good quote.  Actually,

 4     I found a quote by Bruce Willis, but I didn't think that would

 5     be appropriate to mention.  But I did find one quote that was

 6     anonymously attributed, and it was something like this:

 7              It is impossible to undo the past, but you can

 8     acknowledge what you did, tell the truth, ask for forgiveness,

 9     and leave the rest to God.

10              I think that Mr. Rothstein has improved upon that

11     quote because he's done all of those things except, in

12     addition, he has done everything conceivably possible to try to

13     undo the harm.

14              There was a televised interview with him early on, and

15     the Court may understand why that interview took place, but be

16     as it may, in that interview he said that he would do

17     everything possible to repay his legitimate investors.  And, of

18     course, people at the time laughed at that.  It subjected him

19     to more public scorn.  Everybody said, that's ridiculous.  He's

20     sitting there having drinks at the Capital Grill having a good

21     old time.  Some day the truth of that will come forward, but

22     clearly he meant what he said.

23              And it's interesting that probably one of the most

24     vocal opponents of Mr. Rothstein, Attorney William Scherer who

25     happens to be here today who seems to be leading the charge on
```

1  behalf of the claimants in civil litigation along with the

2  bankruptcy trustee, Mr. Stettin, Mr. Scherer who is chair of

3  the bankruptcy creditors committee states, I genuinely

4  believe -- and this is a letter that's attached as Exhibit E to

5  the memorandum.  I genuinely believe Mr. Rothstein is intent on

6  helping to assist and fulfill his expressed promise to make all

7  legitimate investors whole.

8          That's an exceptional statement under the

9  circumstances in this case.  Mr. Scherer has sued Mr. Rothstein

10  and has accused him of everything under the sun and rightfully

11  so.

12          But, as this letter points out, Mr. Rothstein through

13  his criminal defense counsel, Marc Nurik, has been an extremely

14  valuable resource in helping putting the pieces of this ponzi

15  puzzle together.  Mr. Rothstein has cooperated in providing

16  accurate, useful, and trustworthy information that has allowed

17  us to make significant inroads that will, not only benefit the

18  innocent victims I represent, but will also benefit the entire

19  creditor body at large.

20          I mention that because there has been some flowback as

21  of late.  There was a pleading filed yesterday that Your Honor

22  may have seen --

23          THE COURT:  Coquina and Emess.

24          MR. NURIK:  Emess.

25          THE COURT:  Emess.

 1          MR. NURIK:  Right.  And I have to confess to the

 2   Court -- first of all, let me say this.  As the Court may well

 3   imagine, Mr. Rothstein in his capacity of cooperating with the

 4   government in ongoing major investigations concerning this

 5   matter and other matters is not in a position understandable to

 6   provide open and unfettered cooperation to anybody out there.

 7   This must be very carefully done to protect the integrity of

 8   the government's investigation.  And as such, we have done this

 9   in a measured careful fashion.

10          I have been approached by two other sets of attorneys

11   for the purpose of trying -- them having me or Mr. Rothstein

12   cooperate with them.  When I say me, I mean through me.  And we

13   have declined.  We haven't declined, Your Honor, because

14   Mr. Rothstein is not intending on helping everybody.  We have

15   declined because, as the Court may know from the litigation

16   that's gone out there, and I don't want to specifically

17   identify anybody in particular, but there are some concerns

18   about cooperating with certain groups of individuals and

19   certain investment entities out there.  There was certain

20   information that Mr. Rothstein has that, quite frankly, puts

21   him in the position that it would not be appropriate to

22   cooperate with everybody.

23          But in our position in cooperating with the chair of

24   the bankruptcy creditors committee who has said it would

25   benefit the entire credit body at large, we felt that we are

1  doing our job.

2        Similarly, we have provided information --

3  Mr. Rothstein has provided information to Mr. Stettin.  And I

4  find it interesting because if you look at Mr. Stettin's

5  letter, he makes unvarnished statements in this letter about

6  what Mr. Rothstein did.  But he does say that, within the past

7  six weeks, Mr. Rothstein has provided me and my advisers

8  certain information that has been helpful which we expect will

9  continue to be helpful regarding claims that I have and will

10  assert against third parties.  In one instance information

11  provided to me by Mr. Rothstein has contributed to a favorable

12  agreement in principal to settle a pending adversary

13  proceeding.

14        Mr. Rothstein through his counsel has indicated he

15  will continue to cooperate with me and my advisers in

16  connection with our investigation and prosecution of claims

17  against third parties.  Should he do so, I will supplement

18  this.

19        What Mr. Rothstein has done in effect has provided

20  total cooperation in terms of what happened, how he did it, why

21  he did it, where everything is, has given up voluntarily all of

22  his assets for the benefit of the creditors, for the benefit of

23  the investors, for the benefit of his true victims, his

24  legitimate victims, did so without reservation, did so without

25  qualification, came back to do that.  He has cooperated with

1    the trustee.  He has cooperated with claimants' attorneys.

2         Quite frankly, Your Honor, I cannot conceive of

3    anything else that Mr. Rothstein could do under the

4    circumstances to try to undo the harm that he has done.

5         Quite simply, his post offense conduct has been

6    exceptional, has been extraordinary, as the government agrees.

7         Now, the purpose of this is several fold.  And I have

8    already articulated some of it.  But under the consideration of

9    general deterrence, the flip side is to encourage conduct that

10   is, of course, beneficial.

11        The concept of acceptance of responsibility according

12   to the guidelines has a concept within it of protecting

13   important societal interests.  The important societal interests

14   are served here by what Mr. Rothstein did which go way beyond

15   what anybody has done in any of the cases, in any of the 60-odd

16   cases that have been pointed out to Your Honor, and we would

17   respectfully submit that if you recognize that, if you

18   recognize that in providing for a substantial reduction in what

19   type of sentence would otherwise be called for by the

20   guidelines which we submit are not rationally based in this

21   case, you are encouraging others.  And not to do so, with all

22   due respect, you discourage others.

23        If we don't reward someone -- and reward is the wrong

24   word.  If we don't acknowledge someone for coming back and

25   doing everything he did, we discourage others similarly

1    situated which is part of what the whole deterrence argument is

2    about.

3           The 11th Circuit in United States versus Crisp, 454

4    F.3d 1285 says an extraordinary reduction must be supported by

5    extraordinary circumstances.  I would respectfully submit those

6    extraordinary circumstances exist in abundance in this

7    particular case.

8           Now, another factor and the final factor I want to

9    talk about that relates to the 3553 considerations is the

10   factor that is inherent as the underlying policy reason for the

11   guidelines itself, and that is, the need to avoid unwarranted

12   disparities in sentencings of individuals in comparable cases

13   and comparable defendants.

14          In Koon versus United States, 518 United States 81, it

15   says, the goal of the sentencing guidelines is, of course, to

16   reduce unjustified disparities and to reach towards the

17   evenhandedness and neutrality that distinguishing marks of any

18   principal system of justice --

19          THE COURT:  Let me ask you this:  You cited, I

20   believe, in your summary, 39 cases, I believe, that you say

21   were comparable to that of this case.

22          How many of those cases involved a lawyer defendant?

23   How many of those cases involved a lawyer defendant forging

24   court documents?

25          MR. NURIK:  Well, Your Honor, there is, for example,

1    one particular case that involves a lawyer defendant that is

2    the Dreier case.

3              THE COURT:  But he did not forge documents.

4              MR. NURIK:  I concede that, and it clearly --

5              THE COURT:  So --

6              MR. NURIK:  I'm sorry.

7              THE COURT:  So are we comparing apples with apples?

8              MR. NURIK:  Yes, we are.  It is impossible, it is

9    logically impossible to compare every case.  And as the Court

10   notes, in my comparison of this case to Mr. Dreier, I point out

11   in my memo very clearly because of the distinguishing factors

12   of this case with respect to Mr. Dreier's case, we are asking

13   for and recommending a more severe sentence than Mr. Dreier.

14   So we are recognizing the difference.

15             But when we say comparable cases, we are not saying

16   that these cases are comparable in the sense that all of the

17   facts are the same.  As the courts have noted and even the

18   Treadwell court that the government cites, it's impossible to

19   find identical comparisons.

20             What we are trying to show the Court is the upper and

21   lower limits of sentencings that have been meted out and so the

22   Court can have some form of proportionality.  This is in effect

23   the substitute for what the guidelines are supposed to do.  The

24   guidelines are supposed to give the Court proportionality.  In

25   this particular case, the guidelines not working, we are forced

```
 1    to look at all the cases.
 2            Now, let me point out, first of all, the government's
 3    cases that the government cites are very interesting in that
 4    they are -- they have searched for and found cases that involve
 5    other -- let me put this here.  I don't have room for
 6    it -- other sentences that are in excess of 30 years or more.
 7            And what's interesting about the government's analysis
 8    is that the cases that they cite with the exception of one all
 9    involve defendants who have gone to trial.  And that's really
10    quite remarkable because none of those cases obviously involve
11    somebody who came back.
12            For example, United States versus Donald Tarnawa, went
13    to trial, his guideline ranges were 360 months.  He committed
14    obstruction of justice.
15            United States versus Norman Schmidt who got 310 years
16    imprisonment, eight-week trial, his guideline range was life
17    imprisonment.  And Mr. Schmidt stole money from the elderly,
18    the infirmed, and disabled.  He ruined people's lives by
19    defrauding them of their life savings.  And he and his wife
20    went so far as to drive a victim with multiple sclerosis to the
21    bank to get a second check from him.
22            Giuseppe Pileggi, that's another case that's cited for
23    a sentence of 50 years in prison.  That went to trial, life
24    range, guideline range.  The Court did not believe that he was
25    remorseful.  The Court said that they need to protect the
```

1    public from you.

2        United States versus Richard Harkless, a hundred-year

3    imprisonment, went to trial, his guideline range was offense

4    level 43 as well, it scored to 47, more than 670 victims, and

5    the government asked for a life sentence.  And the Court found

6    that the defendant had shown no remorse whatsoever and for

7    years actively sought to avoid responsibility and prevent his

8    victims from recovering any of their money.

9        During trial, he told the jury and this court that he

10   has no regrets about MX factors and that he would make the same

11   choices all over again.

12       United States versus Edwin Okin, a hundred years

13   imprisonment, a three-week trial, his guideline range was 53.

14   And interestingly his deception continued well after the

15   conduct for which he was convicted.  This is out of -- I have

16   all the supporting documents if the Court wants to see them.

17   That's what my paralegal is there with.

18       The Court finds that his deception conditioned well

19   after the conduct for which he was convicted including

20   submission of false financial statements to a federal

21   bankruptcy judge during the related bankruptcy proceeding,

22   structuring of transactions to avoid IRS reporting requirements

23   in an effort to prevent the seizure of funds by federal

24   authorities setting up secret partnerships in an effort to

25   avoid the seizure of assets.

```
 1            Now, I do admit there is one case they cite that the
 2     defendant pled guilty and didn't go to trial and was sentenced
 3     to 309 years imprisonment.  So we looked into that and wondered
 4     why.
 5            Well, it turns out that Mr. Robert Thompson was
 6     actually in jail serving a state sentence when he committed the
 7     crimes, when he committed the fraud.  He managed somehow to
 8     commit the fraud from inside the jail.  And he waited two years
 9     fighting the government until he pled guilty.
10            There's a case they cite Billman in which Mr. Billman
11     and Mrs. Billman went to France.  They fled to France.  They
12     fought extradition.  They came back and they went to trial.
13            There is the Reynolds case where also they went to
14     trial.
15            The point being through all of this, Your Honor, is
16     simply that every single case the government sites in support
17     of sentences that exceed the sentence we are asking for here
18     are totally in opposite.  They are all cases that involve
19     people who went to trial, in one way or another showed the lack
20     of remorse, the lack of respect for the law, committed crimes
21     even while they were pending trial or committed crimes or
22     committed acts of deception while the government was still
23     investigating them, all designed to frustrate the interests of
24     the victims and the rule of law, they are all in opposite.
25            Now, we have given the Court a list of 39 -- roughly
```

1  39 cases.  The purpose of this was just we took a look and

2  said, all right, let's see what the trend is for sentences as

3  far back as we can go to the late '90s for crimes involving

4  frauds over a hundred million dollars.

5        And what we found was, with the exception of the cases

6  that we noted to the Court in our memo that either went to

7  trial and had egregious circumstances -- Mr. Shalom Weiss fled

8  to Austria while the jury was out.  The Court sentenced him

9  essentially to 845 years.  And then when he was finally brought

10 back, he got a substantial reduction to 835 years.

11       There were numerous other people here who committed

12 crimes that involve financial frauds greater than

13 Mr. Rothstein's, and yet they received sentences less than 30

14 years.

15       Now, in comparing, the government tried to compare

16 against cases that I would submit instead of being apples to

17 apples are apples to hand grenades because in all of those

18 cases, the decisions of those defendants blew up in their

19 faces.  If we try to look at an apples to apples comparison, we

20 are really left with the Dreier case.  If there ever was a case

21 that was almost identical to this case, it's the case of Marc

22 Dreier.

23       His background, the reasons why he committed the

24 crime, the crimes themselves, the amounts of loss, the type of

25 fraud, his ego involved, his excessive materialism, everything

1   is so close it's as though when you read about this case, you

2   wonder, did Mr. Rothstein and Mr. Dreier sit down one day in

3   their lives and plan how they were going to do things because

4   it's so amazingly identical.

5        They both, nature and characteristics of the

6   defendant, come from a loving home.  Mr. Dreier's home was

7   affluent.  Mr. Rothstein's was lower middle class.  Mr. Dreier

8   excelled scholastically as did Mr. Rothstein.  Mr. Dreier went

9   to Yale and Harvard.  Mr. Rothstein went to the University of

10  Florida and Nova Law School.

11       Mr. Dreier was described as a funny, smart, personable

12  person, great charisma.  Mr. Rothstein has been described as

13  all of those things plus more.

14       Mr. Dreier started his own firm in 1996.  He had

15  offices in five cities.  RRA that Mr. Rothstein started had

16  offices in five cities.  He was the sole owner, Mr. Dreier.  He

17  controlled everything.  Mr. Rothstein was not the sole owner,

18  but he acted like a boss in that particular office by all

19  accounts.

20       Mr. Dreier overpaid, promised lavish compensation to

21  some of his lawyers.  That's been alleged in this particular

22  case.  Mr. Dreier grew to 250 lawyers in five years.

23  Mr. Rothstein grew to 70 -- close to 80 lawyers in five years.

24       Mr. Dreier, as a result of his scheme which involved

25  using false promissory notes that were allegedly issued by a

1  billionaire developer and he issued these notes to hedge funds,

2  pension funds, and others in a ponzi scheme, did it in a manner

3  that wound up causing the loss of in excess of 400 million to

4  the investors.  Mr. Rothstein, loss of roughly 420-something

5  million dollars.

6         Mr. Dreier had a restitution order of about

7  380 million.  We would submit that Mr. Rothstein's restitution

8  order will be less than the 400 million because what the

9  400 million doesn't account for are the return of profits to

10 certain individuals.  We only count their losses under recent

11 case law, so the restitution will actually be less than the

12 loss under the law.

13        Mr. Rothstein had coconspirators, as the indictment

14 here alleges, people doing a number of different things,

15 helping him in a number of different ways.  Of course I can't

16 go into that in any depth right now.  But as by comparison,

17 Mr. Dreier had coconspirators.  And what they were doing was

18 impersonating people being hedge fund managers, pension plan

19 representatives, impersonating people so they could continue

20 with the ruse.

21        THE COURT:  But the people they were impersonating

22 were not federal judicial officers, were they?

23        MR. NURIK:  Well, Mr. Rothstein clearly,

24 unequivocally, Your Honor --

25        THE COURT:  You are trying to draw a comparison

1    between Dreier and Rothstein, and there's a huge difference

2    there.  The forgery of federal judicial officers' signatures is

3    a huge difference.

4           MR. NURIK:  I would submit it is a significant

5    difference, Your Honor.  And I don't disagree with you.  But

6    how else do we find some proportionality?

7           THE COURT:  I'm not criticizing you for making the

8    argument, but I want to let you know what the Court's concern

9    is.

10          MR. NURIK:  Right.  The nature of what Mr. Rothstein

11   did is different than what Mr. Dreier did.  What Mr. Dreier did

12   is he came up with a scheme involving promissory notes.  And,

13   in fact, as the Court can tell from Mr. Rothstein's letter,

14   that's actually how Mr. Rothstein's crimes began.  But at some

15   point, either because he didn't have access to the same type of

16   people that Mr. Dreier had, he wasn't in a position to do what

17   Mr. Dreier did, he came up with another variation.  And that

18   variation became the sale of interest in settlements at a

19   discount.  The term structured settlements is actually the

20   wrong term.  But these were discounted settlements.

21          And as a result of picking that, it put Rothstein in a

22   position that what he did was he created false lawsuits.  And

23   in creating false lawsuits, his scheme involved how he would

24   use these false lawsuits.

25          Now, clearly it did not involve real cases in the

```
 1   system.  They were false cases.  And it didn't involve real

 2   cases where federal judges' signatures were forged in real

 3   cases affecting real litigants.

 4           Now, by no means am I saying that makes this

 5   necessarily better.  But I wish the Court to understand that

 6   distinction.

 7           Now, Mr. Rothstein put himself in that position.  And

 8   as a result of putting himself in that position, it became at

 9   one point in order to continue his fraud a natural extension of

10   what he was doing to create those forged signatures on false

11   documents involving false cases.

12           Now, while it does clearly put the entire legal

13   profession at risk, disrespect by the public and the Court, it

14   did not involve actual real cases.  He did not actually forge

15   your signature on or a signature on cases other than -- I mean,

16   I think there may have been one case that was a real case.

17           So at the end of the day, yes, he did something

18   significantly different than Mr. Dreier.  Clearly it was wrong.

19   Clearly it was abusive of the system.  But as I said before, if

20   you just take the Dreier case, compare it, there's exact -- the

21   acquisition of assets is almost exact except instead of having

22   some more cars, Mr. Dreier had hundreds of works of art

23   including Matisse, Picasso, Hockney, Lichtenstein, Warhol.

24           They had roughly the same number of homes.

25   Mr. Dreier's boat was 121 foot.  Mr. Rothstein's boat was
```

```
 1   87 feet.  Mr. Dreier gave an explanation why he got involved in

 2   this.  I was desperate for some measure of success that I felt

 3   had eluded me.  Mr. Rothstein told the Court that he had the

 4   absolute inability to deal with even the slightest notion of

 5   failure even though some of the underlying motivations were

 6   identical in this particular case.

 7        The two differences other than what the Court has

 8   noticed are, not only has Mr. Rothstein done everything

 9   possible to assist everyone, it is true that Mr. Dreier did

10   cooperate some degree with the bankruptcy trustee.  Mr. Dreier

11   was caught red-handed in Canada impersonating a hedge fund

12   manager.

13        While he was pending extradition to the United States,

14   he tries to illegally transfer $12.5 million worth of property

15   to his son and he asks someone to falsify papers.  This was all

16   known by the federal court, an egregious act committed after

17   apprehension.

18        Mr. Rothstein, of course, has nothing of that sort.

19   There is a complete 180-degree change from the moment that

20   Mr. Rothstein makes the decision to come back to the United

21   States.

22        The law firms both go into bankruptcy.  200-plus

23   lawyers in the Dreier case are scattered to the wind, support

24   staff as well.  Clients lose money.  There are creditors of the

25   firm who lose money.
```

```
 1            Mr. Rothstein's case, similar, law firm, bankruptcy,

 2   70-plus lawyers and staff now have to go find new jobs, clients

 3   effected.  We heard from one gentleman here today who was

 4   affected by that.

 5            With the exception of what the Court points out and

 6   the political process manipulation that Mr. Rothstein was

 7   involved in, Mr. Dreier's case is virtually identical to

 8   Mr. Rothstein's.

 9            Mr. Dreier after careful consideration by Judge Rakoff

10   gets a 20-year sentence, careful consideration by Judge Rakoff,

11   gets a 20-year sentence.  The government asked for 145 years in

12   that particular case.

13            Mr. Rothstein is not asking this Court for a 20-year

14   sentence.  Mr. Rothstein is asking this Court for a sentence

15   that is one-third greater, a sentence of 30 years in

16   recognition, Your Honor, of the egregious factors that you have

17   pointed out.

18            So when we are comparing, we are comparing apples to

19   apples, but we are adding something here in recognition of

20   something that clearly unequivocally exists.  Mr. Rothstein

21   makes no bones about it.

22            The bottom line in this case is that I think we all

23   agree to what happened and why it happened and how it happened.

24   I don't think there's any dispute as to what he's done since.

25   It's just simply a question of what is a sufficient sentence.
```

```
 1    And I don't envy the Court in making that determination.  But I
 2    think there's been a tendency in some cases to just throw out
 3    fantastic numbers as though that's going to solve the problems.
 4           And in this particular case, if you do that, or if
 5    you -- if you sentence this man to what effectively,
 6    effectively becomes a life sentence -- and let's keep in mind
 7    that most of the people like Mr. Rothstein who commit -- almost
 8    everyone who commits a crime of this substance is not somebody
 9    in their twenties.  They rarely are even in their thirties.
10    They are people in their middle ages.  They are people who have
11    already achieved a certain level of success, a certain level of
12    contacts that enables them to commit schemes like this.
13           And as a result, when you give a sentence of 50 or 60
14    years to people like that, you are in effect pronouncing a life
15    sentence.  And I think everybody understands that.
16           And I think that at the end of the day, for general
17    deterrence purposes, a sentence of 30 years is more than
18    sufficient and it does recognize everything that Mr. Rothstein
19    has done, everything exceptional and extraordinary that
20    Mr. Rothstein has done that not one of these other people has
21    done since he's come back.
22           And if you do that, you send a message out there as
23    well.  You send an equal message.  And the message is simply,
24    you know, if you do the right thing, there will be
25    consideration.  You can't undo the past.  You can only move
```

 1   forward and try to work forward from the present.  And that's

 2   what Mr. Rothstein has done.

 3          Mr. Rothstein has given you a very lengthy letter.

 4          THE COURT:  Is there anything else he wishes to say in

 5   allocution?

 6          MR. NURIK:  With the Court's permission, he would like

 7   to stand up and he would like to address some of the victims

 8   who are in the courtroom.

 9          THE COURT:  Of course.

10          MR. NURIK:  Mr. Rothstein, as you can see, can't

11   write, so he asked me to transcribe what he told me so he

12   can --

13          THE COURT:  Why don't you speak into a microphone, if

14   you could.

15          MR. NURIK:  Do you want to stand here.

16          THE DEFENDANT:  Thank you, Your Honor.

17          THE COURT:  You're welcome.

18          THE DEFENDANT:  To those that I stole money from, to

19   the members and employees of our RRA family who were hurt by

20   what I did, to the clients of RRA who lost money, trusted me,

21   to those in the community that I hurt by my actions, to my

22   fellow lawyers who I brought shame to, to our profession, to

23   the judiciary and the court system that I disrespected and

24   abused, to the charities that I hurt, to my family, I am truly

25   and deeply sorry for what I have done.  I don't expect your

```
 1    forgiveness.  I don't.

 2           I do promise you that no matter what happens here

 3    today, that I will continue to do everything within my power to

 4    undo the harm, the terrible harm, that I have caused.  I'm

 5    ashamed and embarrassed.  Thank you.

 6           THE COURT:  Before we hear from the government, I need

 7    to take just a five-minute break.  So we'll stand in recess for

 8    five minutes.

 9           (Thereupon, a recess was taken at 10:42 a.m.)

10           THE COURT:  Folks, please be seated.

11           The record will reflect that Mr. Rothstein is present

12    represented by counsel.

13           Mr. LaVecchio.

14           MR. LaVECCHIO:  Thank you, Your Honor.

15           Your Honor, Mr. Nurik is a terrific advocate.

16           THE COURT:  That he is.

17           MR. LaVECCHIO:  And that was a terrific presentation

18    that he made.  Some of his arguments are just fundamentally

19    flawed.  First of all, when he tells the Court right from the

20    git-go that in cases like this, frauds of this nature, you

21    should just ignore the guidelines, it's not only factually

22    incorrect, it's really incorrect, because under Gall you are

23    required to consider the guidelines.

24           And there's a good reason for that.  These guideline

25    calculations were formulated by the U.S. sentencing commission
```

 1    which is an independent agency within the judiciary in

 2    accordance with a congressional mandate.  Each year the

 3    commission may submit amendments to congress based in large

 4    part upon the sentencing practices that are occurring in

 5    federal courts, and congress either accepts those amendments or

 6    it can change those amendments.  And, in fact, over the years

 7    there have been several occasions when congress has modified

 8    those changes that have been advocated by the sentencing

 9    commission.

10         This is important because it creates two key issues.

11    One is that the guidelines at this point represent over 20

12    years of empirical data concerning actual sentencing practices

13    in the federal court, and secondly, congress is responsible for

14    the manner in which the guidelines are calculated.

15         So Mr. Nurik doesn't mount a legal challenge to the

16    guidelines.  He's not saying that the advisory guidelines are

17    unlawful or that they are unconstitutional in any way.  Rather,

18    he maintains that in his opinion they are somehow unfair as

19    applied in fraud cases of this nature, that they result in

20    sentences that he considers too harsh.  But that's not a legal

21    objection.

22         He says it has an unintended result of these sentences

23    being harsh.  I don't think it's unintended.  I think it's

24    absolutely intended.  Congress intended these sentences to be

25    harsh.

 1          If Mr. Nurik thinks the guidelines are too harsh, he

 2   should write a letter to his congressman.  But that's not what

 3   we are here to do.  We are here to apply the law in the case.

 4          When we apply the law in the case, contrary to his

 5   assertion that you need to throw out the guidelines, under Gall

 6   and other decisions, you are required to consult the guidelines

 7   and consider the guidelines in formulating a sentence in this

 8   case.

 9          And as we set forth in our response, the supreme court

10   has held that the guidelines reflect a rough approximation of

11   sentences that might achieve the goals of 18 U.S.C., Section

12   3553(a).

13          So it's the government's position that the only

14   statistic that counts, the only statistic that you should be

15   considering in reaching an appropriate sentence in this case is

16   the guidelines calculation.

17          The other statistics to which Mr. Nurik has made

18   reference today and in his memo are of absolutely no

19   consequence.  You know, when I was reading his memo originally

20   and I was listening to him today, I was reminded of the words

21   of Mark Twain who said that there are lies, there are damn

22   lies, and there are statistics.

23          And that's what these statistics are that he's

24   presented to this Court.  Again I'm not saying Mr. Nurik is

25   lying but the statistics do because he includes in Exhibit C of

1    his submission mean and median sentences imposed for various

2    categories of offense.  These have absolutely no bearing on the

3    task that we are here to do today.  All median sentence means

4    is that half of the offenders got less and half of the

5    offenders got more.

6           So he sites the 2009 murder median sentence which is

7    22.5 years.  Well, that means that some people got life or

8    death and some people may have gotten 15 years depending upon

9    their culpability, their cooperation, and other factors which

10   the statistics by themselves don't reflect.  He cites the fraud

11   median for 2009 which comes to a whopping 18 months.

12          Now, undoubtedly that includes someone who may have

13   cashed a couple of Social Security checks that were issued to a

14   dead relative and ended up getting probation, or someone like

15   Norman Schmidt who we cited in our memorandum who operated a

16   ponzi scheme involving a loss figure of only $43 million and

17   ended up getting sentenced to 310 years imprisonment which was

18   affirmed on appeal.

19          So the real relevant question before this Court is

20   where on that very, very broad continuum this particular

21   defendant falls.

22          And in making that determination, you shouldn't be

23   looking at mean or median sentences.  You should be looking

24   specifically at the guidelines and the 3553(a) factors.

25          Now, 3553 lists seven factors that the Court must

consider in imposing a sentence in the case.  You must consider

them all.  That doesn't mean you need accept any one of them as

prevailing over any of the others.

And the defendant bases his argument in large part on

3553(a)(6), the need to avoid unwarranted sentence disparities

among defendants who have been found guilty of similar conduct.

And in that regard today, as he did in his memorandum, he has

emphasized the case of Marc Dreier who was sentenced in the

Southern District of New York which admittedly has some

similarities to this case.  However, it also has some

significant differences.

First of all, we look to the fraud.  The essence of

Mr. Dreier's fraud was that he was issuing promissory notes to

individuals which allegedly were backed by one of Mr. Dreier's

wealthy clients who knew nothing about the scheme.

However, the people who invest in this were making

loans.  And as in any other extension of credit, any loan has

some risk to it, some risk that it's not going to be repaid.

So those Dreier investments, if you will, were really

not investments.  They were loans, and they weren't a sure

thing.

By contrast, in this case, what Mr. Rothstein created

was these investment vehicles called confidential settlements.

And he made those up completely out of holed cloth.  And he

maintained in perpetrating this scheme that he was actually

1   holding the money behind these investments in escrow and that

2   it would only be released to a particular investor.  So if the

3   scheme was true, it was a sure thing.  No investor could

4   possibly lose his money.

5           And to perpetrate this scheme, he created phony legal

6   documents, and significantly, utilizing the trust accounts at

7   his law firm, he created phony bank statements showing that

8   millions of dollars were being held in escrow in banks under

9   the name of the law firm when, in fact, the accounts were

10  essentially empty.

11          He and others also created a phony web page which

12  mirrored the bank's web page in which they could alter the

13  figures to make it appear that money was in accounts when, in

14  fact, it was not.  And, as noted by the Court, he also forged

15  the signatures of judges on court orders.

16          Now, I have to correct one factual matter that

17  Mr. Nurik said.  He was doing so well, but I have to correct

18  one thing that he said.  Contrary to what he said, the

19  forgeries that were involved with judges' signatures in this

20  case did involve a real case.

21          What ended up happening was the defendant had told

22  some clients that they had won a lawsuit when, in fact, they

23  had not.  And he forged certain court orders in order to induce

24  them to pay approximately $57 million into the accounts of his

25  law firm which were thereupon used to perpetrate the ponzi

 1   scheme in part.

 2          So he did forge court orders, and as far as I know,

 3   Mr. Dreier did not.  He may have posed as a banker, but he

 4   never posed as a judge.  And I think for anyone to do that is

 5   outrageous.  But for an attorney to do that is almost

 6   incomprehensible.

 7          I would say that in this case in sum, Mr. Rothstein's

 8   case was more devious, it was more contrived, and it was more

 9   sophisticated than Mr. Dreier's.  We are not looking in any

10   respect at an unwarranted disparity in sentencing in this case.

11   If you sentence Mr. Rothstein to much more than Mr. Dreier,

12   it's a warranted disparity.

13          And more significantly, as set forth in our response,

14   from a legal standpoint, the defendant can't point to a

15   defendant in a different case in a different district sentenced

16   by a different judge and somehow claim that as some kind of

17   benchmark that this Court should utilize in fashioning his

18   sentence.  Even the 9th Circuit doesn't buy that argument.

19          So, rather, sentencing in this case has to be

20   individualized.  And it's based upon all the 3553 factors in

21   conjunction with your consideration of the guidelines, which

22   they maintain you should not.

23          So when we are considering in this case were the Court

24   to just consider 3553(a)(1), the nature and circumstances of

25   the offense, if you were to consider that standing alone, well,

1    this defendant essentially placed himself in the pantheon of

2    fraudsters.  When we look at that continuum that I was talking

3    about, he deserves -- he would otherwise deserve to be at the

4    high end.  He would deserve to be sentenced as the people were

5    that we cited in our memorandum.

6         However, we in this case agree that the Court should

7    look to the history and characters of the defendant.  And the

8    post offense steps he's taken as we outlined in the response.

9    And I'm not going to reiterate it here.

10        THE COURT:  Do you agree that the post offense conduct

11   falls within the history and characteristics of the defendant?

12        MR. LaVECCHIO:  I think it does, Your Honor.  I think

13   that would be the appropriate place to put this.  We are in a

14   unique case here.  And we are asking you to take consideration

15   of unique factors.  And I would think that that's the

16   appropriate thing for the Court.  If you had to categorize it,

17   that's what you could categorize it as.

18        THE COURT:  I think I have to categorize it.

19        MR. LaVECCHIO:  And I think that's the appropriate

20   place to do it, Your Honor.

21        And so if we look at those 3553(a)(2) factors, so we

22   look at everything the defendant has done, we balance it

23   against the seriousness of his offense, the guidelines

24   calculations which they concede are accurate, we look at the

25   need for the sentence to reflect the seriousness of the

 1   offense, promote respect for the law, provide a just

 2   punishment, afford adequate deterrence, then it's the

 3   government's considered judgment in this case that a sentence

 4   of 40 years is appropriate.

 5          And to the extent Mr. Nurik asked why 40, why not 35

 6   or 30 or 27 or whatever else, the case that I look to most

 7   actually was the case of the Brandau case which came out of

 8   West Palm Beach and it's cited in our memorandum.  And that was

 9   another huge fraud case here in south Florida, albeit not as

10   large as this case.

11          That was 17 million, and this one is over 400 million

12   in terms of losses.  In that case they were selling phony

13   viatical contracts which isn't unlike selling phony legal

14   confidential settlements.  And he fought.  I mean, he put the

15   government to its test in that case.  It was a lengthy trial.

16   He never assisted the government in any respect.  Like I said,

17   the loss amount was much less, and he ended up getting 55

18   years.

19          So I'm looking for a benchmark.  That's the benchmark

20   I was using.  That's why I think under these circumstances,

21   when compared to that, I think 40 years is a reasonable

22   sentence in this case.  And undoubtedly some people would think

23   that's too harsh.  Undoubtedly Mr. Nurik would think that's too

24   harsh.  And I don't doubt some people will find that too

25   lenient.

 1          But after our considered judgment, and we didn't pull

 2     this out of our pocket, this recommendation, we think it's a

 3     just sentence and a fair sentence under these circumstances.

 4          Does the Court have any questions?

 5          THE COURT:  No, sir.

 6          MR. LaVECCHIO:  Thank you, Judge.

 7          THE COURT:  The Court has considered the statements of

 8     all parties, the presentence report which contains the advisory

 9     guidelines, the statutory factors set forth in 18 United States

10     Code, Section 3553(a), the sentencing memorandum filed on

11     behalf of Mr. Rothstein, the government's responsive sentencing

12     memorandum, a sentencing statement of victims Coquina

13     Investments and Emess Capital, and numerous letters including

14     that of Mr. Rothstein, all of which have been docketed and are

15     a part of the public record.  In light of Mr. Rothstein's

16     agreement to forfeit all assets, the Court finds that he is

17     financially unable to pay a fine.  However, restitution is

18     mandatory.

19          In its simplest form, this case is about the selling

20     of fake financial products.  The marketing, however, was

21     anything but simple.  It was sophisticated rivaling that of

22     Madison Avenue's advertising elite.  It was all about image,

23     wealth, power, and influence, WPI.

24          The marketing component of the fraud focused on

25     attracting investors with deep pockets.  Mr. Rothstein

1    displayed all of the trappings of success, the multi million

2    dollar homes, the expensive cars, the boats, the restaurants,

3    the jewelry, and a 70-lawyer law firm that appeared to be

4    thriving.

5            He maintained political connections stretching from

6    the Broward Sheriff's Office on one end of Broward Boulevard

7    all the way down to the Fort Lauderdale Police Department on

8    the other end of Broward Boulevard, to the governor's mansion

9    in Tallahassee and all the way to the United States Congress in

10   Washington and down Pennsylvania Avenue to the White House.

11           The local society page was constantly adorned with

12   photographs of Mr. Rothstein and his wife arm in arm with

13   sports celebrities, politicians, community leaders, and

14   socialites.  The political contributions which were funneled

15   through the law firm's attorneys, their wives, and other

16   employees placed the Rothstein brand in much demand.

17           The philanthropy which included donations to

18   hospitals, religious and charitable organizations endeared

19   Mr. Rothstein as one of Broward County's most prolific

20   benefactors.

21           The police security details, the dinners with law

22   enforcement officers, and the trips to sporting events with BSO

23   brass created an appearance of legitimacy.  But we now know it

24   was all a facade, a fraud.

25           When considering the nature and circumstances of the

```
 1    offense, it is important to recognize that this ponzi scheme

 2    was not the result of poor business decisions.  Quite to the

 3    contrary.  This was fraud from the inception perpetrated over a

 4    period of four years causing approximately 400 investors to

 5    lose more than $400 million.

 6            As is the case with most ponzi schemes, there comes a

 7    time when the new money coming in is not sufficient to satisfy

 8    the demands of older investors and the ponzi implodes.

 9    Unfortunately, many innocent people have been swept up by the

10    tsunami that followed.

11            The seriousness and the magnitude of this crime must

12    be given significant weight in determining an appropriate

13    sentence.

14            The centerpiece of Mr. Rothstein's mitigation argument

15    is the alleged unwarranted disparities among defendants with

16    similar records who have been found guilty of similar conduct.

17    He describes the case of 59-year-old attorney Marc Drier who

18    orchestrated a ponzi scheme over a four-year period stealing

19    approximately $380 million from 13 hedge funds as erringly

20    similar to this case.

21            In Mr. Drier's case, the district judge imposed a

22    sentence of 20 years imprisonment finding the sentence to be

23    sufficient but not more than necessary to satisfy the

24    requirements of sentencing.  However, as Mr. Rothstein concedes

25    in his sentencing memorandum, Mr. Drier never attempted to
```

1  corrupt the federal judicial system by creating false and

2  fraudulent court orders and forging the signatures of federal

3  judicial officers to those orders.

4      Mr. Rothstein created the fraudulent court orders in

5  order to perpetuate the fraudulent scheme.  These actions

6  constitute the most egregious wrongs a licensed attorney can

7  commit and represent a total disrespect for the authority and

8  dignity of the courts.

9      There can be no conduct more reviled than an attorney

10 perpetrating such a fraud on the Court.

11     Accordingly, the Court finds major dissimilarities to

12 the Drier case.

13     Mr. Rothstein's argument of unwarranted sentencing

14 disparities was illustrated by 39 cases which were cited in the

15 summary found at docket entry 272-11.  I would merely point out

16 that if any of these cases involved an attorney defendant

17 forging the signatures of judicial officers, then we could

18 compare apples with apples.  Otherwise, this argument is

19 unpersuasive.

20     Moreover, even if there was a comparable fact pattern,

21 it would not be binding on this Court.

22     Mr. Rothstein suggests that he is deserving of a

23 downward departure under United States sentencing guidelines

24 section 5K2.0 or a downward variance based upon his

25 extraordinary post offense conduct.

1          The facts supporting his request include his voluntary

2    return from Morocco, his immediate and extensive debriefing by

3    federal agents, his participation in undercover operations, his

4    immediate decision to identify and turn over all available

5    assets to the government and consent to forfeiture, his

6    assistance in providing victims' representatives with

7    information for pursuit of claims and his remorse and

8    rehabilitation.

9          The government does not oppose a variance asserting

10   that it is beyond dispute that Mr. Rothstein's post offense

11   conduct has been extraordinary.  However, the government urges

12   a sentence of 40 years imprisonment as opposed to the 30-year

13   sentence suggested by Mr. Rothstein.

14         It does not appear that a downward departure under

15   Section 5K2.0 would apply since cooperation is adequately taken

16   into consideration by Section 5K1.1 which requires a motion by

17   the government.

18         In addition, Section 3E1.1 covers acceptance of

19   responsibility for which a three-level reduction was granted,

20   albeit, as the defendant points out, he was still left with a

21   total offense level exceeding 43 which computes to a guideline

22   sentence of life.

23         A downward variance would require, in the Court's

24   estimation, a showing that the post offense conduct related to

25   one of the factors referenced in 18 United States Code, Section

1   3553(a).  In that regard, the Court finds that the post offense

2   conduct would fall within the broad factor of the history and

3   characteristics of the defendant.

4          Since the government has dealt exclusively with

5   Mr. Rothstein subsequent to his arrest, the Court has no reason

6   to doubt the government's representation as to the value of

7   Mr. Rothstein's post offense conduct.  Accordingly, the Court

8   will consider the conduct and assign appropriate weight to this

9   sentencing factor.

10         Having carefully considered the guidelines and Section

11   3553(a)1 factors, the Court turns its attention to the purposes

12   of a sentence as stated in section 3553(a)2.  And those

13   purposes are:

14         To reflect the seriousness of the offense, to promote

15   respect for the law, to provide just punishment, to afford

16   adequate deterrence to criminal conduct, to protect the public

17   from further crimes of the defendant.

18         The seriousness of these crimes is self-evident.

19   Approximately $1.2 million was invested resulting in a loss of

20   over $400 million to over 400 investors.  The defendant admits

21   on page 10 of his sentencing memorandum that the nature and

22   circumstances of the offense weigh heavily in favor of a

23   substantial sentence.  The defendant further admits that he

24   deserves and expects to receive a lengthy sentence.

25         However, he tempers his comments by stating that the

```
 1   sentence imposed should be based on the gravity of the crimes
 2   rather than disapproval of his lifestyle.  The Court agrees
 3   that the sentence should be based on the gravity of the crimes.
 4   But as the Court pointed out earlier during Mr. Nurik's
 5   argument, that the Court also feels that lifestyle was related
 6   to the 3553(a) factors.
 7        The defendant's greed and arrogance are part of his
 8   history and characteristics just as his extraordinary post
 9   offense conduct.  His opulent lifestyle funded by stolen money
10   is a major part of the nature and circumstances of this
11   offense.
12        The forgery of signatures of three different members
13   of the federal judiciary on fake court orders show a lack of
14   respect for the law.
15        And lastly, the issue of adequate deterrence is of
16   particular significance in the case of white collar crimes.
17        The crimes require thought, preparation, and
18   calculation.  Longer sentences for economic crimes have been a
19   congressional goal over the past decade.  As noted by the
20   government, the 11th Circuit in Martin stated that economic and
21   fraud based crimes are prime candidates for general deterrence.
22        In the final analysis, the Court is guided solely by
23   the standard of reasonableness.  In order to determine what is
24   reasonable, the Court must take a step back and ask:
25        What makes the Rothstein case different.  Why has this
```

1    case generated such public interest.  Why has this case created

2    such a media frenzy.

3         I am sure there are many reasons, but I think the

4    primary reason is that Mr. Rothstein infiltrated so many

5    spheres of public interest.  He infiltrated so many parts of

6    our daily lives – politics, sports, charities, law enforcement,

7    the judiciary, the society page, TV commercials, the legal

8    profession, billboards, magazines.

9         Mr. Rothstein was seemingly omnipotent.  He was

10   everywhere.  Not only was he everywhere, but he was everywhere

11   with excesses.  When someone of that perceived stature is found

12   to be a cheat, we start to question how we were deceived and

13   even reexamine our own values.

14        I think that public perception is important in

15   determining adequate deterrence.  Certainly the public is well

16   aware of these crimes and the manner in which they were

17   committed.

18        Having considered the purpose of a federal sentence

19   guided by the standard of reasonableness, the Court finds that

20   a sentence of 50 years, that is 600 months, imprisonment is

21   sufficient but not greater than necessary to comply with 18

22   United States Code, Section 3553(a)2.

23        Therefore, it is the judgment of this Court that the

24   defendant, Scott W. Rothstein, is hereby committed to the

25   custody of the Bureau of Prisons to be imprisoned for a term of

1    600 months.

2         This term consists of 240 months as to each of

3    Counts 1 and 2, such terms to be served consecutively to each

4    other, 120 months as to Count 3 to be served consecutively to

5    Counts 1 and 2, and 240 months as to each of Counts 4 and 5,

6    such terms to be served concurrently with each other and

7    concurrently with Counts 1, 2, and 3.

8         It is further ordered that, pursuant to 18 United

9    States Code, Section 3664(d)5, the victims' losses are not yet

10   ascertainable.  Therefore, the Court will set the date of

11   August 30, 2010 at 9:00 a.m. for final determination of

12   victims' losses.

13        Upon release from imprisonment, Mr. Rothstein shall be

14   placed on supervised release for a term of three years as to

15   each of Counts 1 through 5 to be run concurrently.  Within 72

16   hours of release, Mr. Rothstein shall report in person to the

17   probation office in the district where released.

18        While on supervised release, Mr. Rothstein shall not

19   commit any crimes, shall be prohibited from possessing a

20   firearm or other dangerous devices, shall not possess a

21   controlled substance, shall cooperate in the collection of DNA,

22   and shall comply with the standard conditions of supervised

23   release including the following special conditions:

24        Financial disclosure requirement, no new debt

25   restriction, self-employment restriction, and permissible

```
 1    search, all as noted in part G of presentence report.  It is
 2    further ordered that Mr. Rothstein is assessed $100 as to each
 3    of Counts 1 through 5 for a total of $500.
 4           The total sentence imposed is 600 months imprisonment,
 5    three years supervised release, and a $500 special assessment.
 6    Forfeiture of the defendant's right, title, and interest in
 7    certain property is hereby ordered consistent with the plea
 8    agreement.
 9           The United States shall submit a proposed order of
10    forfeiture.  Actually, we have already done the preliminary and
11    we are -- Ms. Lehr, do you want to be heard?
12           MS. LEHR:  Yes, Your Honor.  All you need to do is
13    incorporate docket entry 134 into the judgment.
14           THE COURT:  All right.  Submit a -- oh, into the
15    judgment?
16           4MR. PRIORE:  Yes, Your Honor.
17           THE COURT:  Okay.  Now that sentence has been imposed,
18    does the defendant or his counsel object to the Court's finding
19    of fact or to the manner in which sentence was pronounced?
20           MR. NURIK:  I don't think under the plea agreement we
21    have the right, Your Honor.
22           THE COURT:  Let me advise you, if there's anything
23    that you did not waive, that you do have the right to appeal
24    those matters.  Any notice of appeal must be filed within ten
25    days -- actually, I think this should be 14 days after entry of
```

1   judgment being entered in this case.  If you are unable to pay

2   for the cost of an appeal, you made apply for leave to appeal

3   in-forma-pauperis.

4           Gentlemen, is there anything further?

5           MR. NURIK:  May I have a moment, Your Honor?

6           THE COURT:  Sure.

7           MR. LAVECCHIO:  Nothing from the government, Your

8   Honor.

9           MR. NURIK:  Nothing, Your Honor.

10          THE COURT:  All right.  We will stand in recess.

11          (Thereupon, the hearing was concluded at 11:24 a.m.)

12                              - - -

13                    C E R T I F I C A T E

14

15          I hereby certify that the foregoing is an

16  accurate transcription of the proceedings in the

17  above-entitled matter.

18

19

20  6/21/10                 s/ Tammy Nestor
                            Tammy Nestor, RPR
21                          Official Federal Court Reporter
                            299 E. Broward Boulevard, Suite 203
22                          Fort Lauderdale, FL 33301
                            954-769-5496

23

24

25